[No. 59594-1. En Banc. September 9, 1994.]

QUEEN CITY FARMS, INC., *Respondent*, v. THE CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, ET AL, *Petitioners*.

54

*Aiken, St. Louis & Siljeg, P.S.,* by *Pamela A. Lang* and *Steven Soha; Karr Tuttle Campbell,* by *William J. Price* and *Jacquelyn A. Beatty (Wiley, Rein & Fielding, Thomas W. Brunner, Robert B. Bell, Daniel E. Troy, Russell Sullivan, Laura A. Foggan, Carol Barthel,* and *Vicki Robinson,* of counsel), for petitioners Central National Insurance Company, Highlands Insurance Company, and Maryland Casualty Company.

*Lane Powell Spears Lubersky,* by *David M. Schoeggl, Wilbur J. Lawrence,* and *Linda Blohm Clapham,* for petitioner Earnest A. Moore & Companies.

*Preston Gates & Ellis,* by *Paul J. Lawrence, Desmond L. Brown,* and *Brian N. Poll,* for respondent.

*Thomas S. James, Jr.,* and *Donald S. Kunze* on behalf of the Insurance Environmental Litigation Association, amicus curiae for petitioners.

*Patrick M. O'Loughlin; Victor C. Harwood III, Edward Zampino,* and *Bernadette M. Peslak* on behalf of Aetna Casualty and Surety Company, amicus curiae for petitioners.

*Andrew H. Salter* on behalf of Liberty Mutual Insurance Company, amicus curiae for petitioners.

*Charles C. Gordon* and *William G. Clark* on behalf of The Boeing Company, Champion International Corporation, Time Oil Company, and Monsanto Company, amici curiae for respondent.

*Frank Conklin; Donald C. Brockett, Prosecuting Attorney for Spokane County,* and *James Emacio, Chief Deputy,* amicus curiae for respondent.

[Dissents by Utter and Madsen, JJ., amended by orders of the Supreme Court March 22 and July 20, 1995, and September 29, 1994.]

BRACHTENBACH, J. — This case involves coverage issues under comprehensive general liability policies for losses resulting from contamination of groundwater when toxic materials leaked from waste pits where hazardous materials had been deposited. A number of issues involve construction of policy provisions, particularly pollution exclusions. Additional issues involve misrepresentation defenses raised by some insurers. We affirm the Court of Appeals' holding that coverage is provided under one insurer's policies, that factual questions remain as to whether there is coverage under the remaining policies at issue, and that the insurers' misrepresentation defenses fail. Our analysis differs in some respects from that used by the Court of Appeals, particularly as to the misrepresentation issues.

Queen City Farms, Inc. (QCF) brought this declaratory judgment action against several of its insurers seeking a determination that the insurers were responsible for cleanup costs incurred by QCF as a consequence of contamination resulting from leaking of hazardous wastes from a waste disposal site on property owned by QCF in Maple Valley. In 1979 the United States Environmental Protection Agency (EPA) and the Washington State Department of Ecology began investigating the property for hazardous waste contamination. In 1983, EPA testing revealed groundwater contamination. QCF was identified as a potential responsible party under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (current version at 42 U.S.C. § 9601 *et seq.* (1988)). Strict liability is imposed under CERCLA. QCF entered consent decrees with the EPA agreeing, with The Boeing Company (Boeing) (the major disposer of wastes at the site), to clean up the site. By the time of trial, QCF had paid $1.8 million in cleanup costs, with potential liability of $5.5 million.

Queen City Farms, Inc., was incorporated in 1966, and is a subsidiary of the Seattle Disposal Company (SDC). In 1951, SDC purchased land in Maple Valley, Washington, known as Queen City Farms, for use as a hog farm. The hog farm operated for a few years in the 1950's.

In the mid-1950's, representatives from the King County Health Department approached SDC's owners and requested that they permit oil, paint, roofing materials, and tar to be disposed of on the property because the County did not own an adequate disposal site. In 1956, local industries began depositing industrial wastes into a natural depression on the property.

In order to expand the capacity of the waste pit, the owners scooped out the depression, and formed three pits separated by berms, arranged so that as the first pit filled, the liquid wastes would flow into the next pit, and then into the third when the second filled. The ponds covered about an acre, and had a total capacity of about 1 million gallons.

Seattle Disposal Company also dumped wastes into the pits, but most of the waste disposed of in the pits was trucked in by Boeing. Boeing dumped wastes from 1957 to 1969. In one 3-year period, nearly 3 million gallons of Boeing's wastes were dumped into the pit. Much of this waste consisted of metal plating wastes with high concentrations of heavy metals. When tested in 1983, groundwater contamination from the wastes in the pits had resulted in highly toxic levels of one of the chemicals used in the plating process, hexavalent chromium.

No permits were ever issued for the disposal operation, although the King County Health Department and the State Pollution Control Commission were aware of and monitored the operation to some extent. One of SDC's owners testified that the ponds were checked all the time but the operation was never shut down. No thorough investigation of possible contamination ever occurred until the investigation begun in 1979, but in 1959 there was some evidence of contamination seeping into a nearby stream. When QCF was advised of the

problem, it hired an engineering firm to conduct a study. An engineer working for the firm testified that he inspected the site, and found that branches sticking into the lake or stream had a coating of brownish red material on them. Testing of water on the property (including well water) was made, but did not reveal groundwater contamination.

In 1966 Queen City Farms was incorporated, and title to the property was transferred to it (the same people owned SDC and QCF). QCF continued to operate the disposal site. Two of the owners owned summer homes on the Maple Valley property near the waste ponds. The water supply for the homes and other activity on the farm came from an underground spring and well located about 2,000 feet downhill from the ponds. One of the owners of QCF (and SDC), Josie Razore, had the well water tested annually, but no contamination has ever been found in the well.

Evidence established that the ponds never overflowed, even when it rained. Periodically, when the level would get high, the owners would burn the pits. This lowered the level. The burning created a tarlike sludge that would sink to the bottom of the pits; there was testimony it lined the pits. There was testimony that hardpan clay was believed to lie under the pits. There was also evidence that the ground in the surrounding area was largely sand and gravel, and one of the owners testified that before the pits were sealed with burning, the waste would drain into the ground, where there was sand and gravel. Testimony of Banchero (May 12, 1988), at 51. He also said that "there's clay area around there, and I didn't know exactly how far down clay might have been. . . ." Testimony of Banchero (May 12, 1988), at 51. He testified that in the early years of the dumping several pitfulls of liquid drained from the pits. Testimony of Banchero (May 12, 1988), at 75-76, 86. A gravel business began on the property in the 1950's and continues to operate. The owners testified they thought the clay, sand, and gravel would filter the wastes.

The owners testified that they never expected wastes from the ponds to contaminate the surrounding ground and groundwater.

Dumping continued until 1969, and then effectively ceased. Thereafter, the ponds remained on the property.

When this action was brought to determine QCF's insurers' responsibilities for coverage for the cleanup costs, numerous insurers were defendants. A number have settled, and others have brought successful motions for summary judgment of dismissal on various grounds. At this stage, four insurers remain in the action: (1) Ernest A. Moore & Companies (Lloyd's), (2) Highlands Insurance Company, (3) Central National Insurance Company of Omaha, and (4) Maryland Casualty Company. Highlands and Central National are sister companies, and will hereafter be referred to collectively as "Central National". These insurers provided excess liability coverage during relevant periods, from January 1, 1966 to January 1, 1969 (Lloyd's); from January 1, 1977, to March 11, 1982 (Central National) (both companies); and from January 1, 1975, to January 1, 1977 (Maryland Casualty).

The insurance policies issued by the insurers are comprehensive general liability policies, covering all risks or damage arising from an "occurrence" unless excluded.

The insurers other than Lloyd's sought summary judgment dismissing QCF's claims, arguing that coverage was excluded as a matter of law under pollution exclusions in their policies. (The Lloyd's policy does not contain a pollution exclusion.) The motion for summary judgment was denied. The case went to the jury under the theory that the pollution exclusions provided for the same coverage as did the occurrence provisions of the Central National and Maryland Casualty policies, because the trial court had ruled the two clauses are functionally the same.

QCF argued that under the occurrence clause, which defined an occurrence as "an accident or happening or event or a continuous or repeated exposure to conditions which

unexpectedly and unintentionally results in personal injury, property damage", Clerk's Papers (Appellant) vol. 2, at 448, 466, 495, 519, a subjective standard of expectation applies. The trial court ruled and instructed that if QCF either subjectively or objectively expected or intended the leakage into the groundwater, there would be no coverage. By its answers in a special verdict form, the jury found that as of December 31, 1968, QCF expected or intended that material from the waste ponds would leak into the groundwater.

Lloyd's and Central National each asserted as a complete defense to coverage that QCF made material misrepresentations in obtaining insurance coverage. The jury found by special verdict that QCF or its brokers intentionally made material misrepresentations or concealments about the QCF site to these insurers with the intent to deceive.

QCF appealed, arguing that the trial court erred in submitting the question about its expectation under an objective standard. QCF also raised a number of issues relating to the misrepresentation defenses. Maryland Casualty and Central National cross-appealed, arguing that the pollution exclusion clauses in their policies preclude coverage as a matter of law.

The Court of Appeals agreed with QCF that a subjective standard applies to the question of its expectation of groundwater contamination, and ordered a new trial to determine coverage under Maryland Casualty's and Central National's policies. The Court of Appeals also agreed with QCF that Lloyd's and Central National failed to timely tender back premiums, and therefore were precluded from relying on a misrepresentation defense. The Court of Appeals concluded that Lloyd's was responsible for coverage because its policy was in effect before QCF expected or intended leakage into the groundwater, and it was not entitled to a misrepresentation defense. The Court of Appeals remanded for entry of judgment against Lloyd's. *Queen City Farms, Inc. v. Central Nat'l Ins. Co.*, 64 Wn. App. 838, 827 P.2d 1024 (1992), *review granted*, 120 Wn.2d 1025 (1993).

The insurers petitioned for review. Their petitions were granted. QCF filed a conditional petition for review, asking the court to review certain issues only if it granted the insurers' petitions for review.

A number of amicus curiae briefs have been filed.

## "Unexpectedly and Unintentionally": Objective or Subjective Standard

### Whether QCF Preserved the Subjective-Objective Issue for Appeal

The trial court ruled on a motion for summary judgment that personal injury or property damage was expected or intended if the insured subjectively or objectively intended or expected the injury or damage. The jury was instructed that QCF had the burden of proving that it did not "intend or expect that materials would leak from the disposal ponds into groundwater" and that "a reasonable person in the position of Queen City Farms should not have expected that the materials from the disposal ponds would leak into groundwater." Instruction 4; Clerk's Papers (Appellant) vol. 4, at 1116. QCF objected to the jury instruction, but did not object to the special verdict form.

The insurers argue that QCF has not properly preserved the subjective/objective issue for appellate review because it made no objection to the special verdict question incorporating the objective standard. Question 2 on the special verdict form asked: "Did there come a time . . . that Queen City Farms expected or intended, or should reasonably have expected, that materials would leak from its disposal ponds into groundwater?" Clerk's Papers (Appellant) vol. 4, at 1132. The insurers' basic argument appears to be that the lack of any objection to this question constituted a waiver of QCF's objection. Additionally and more specifically, the insurers argue that QCF should have objected to the compound nature of the special verdict question so that a new trial would not have been necessary if QCF were to prevail on its argument for application of a subjective standard on

review, and that QCF's failure to do so constituted a waiver of the factual issue of subjective expectation under CR 49(a).

CR 49(a), which governs the use of special verdict forms, provides in part:

> If . . . the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his rights to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

The rule does not support the insurers' argument. As QCF correctly states, the subjective/objective issue was resolved on a summary motion brought before trial. The trial court refused to reconsider the matter. Under the trial court's ruling, the jury was to decide whether QCF subjectively or objectively expected or intended the leakage of material into groundwater. Under that ruling, there was no triable issue of fact as to whether QCF subjectively, and *only* subjectively, expected or intended the leakage. Thus, there was no further issue of fact about subjective expectation which should have been submitted to the jury.

Moreover, the case upon which the insurers rely does not support their argument. In *Anderson v. Cryovac, Inc.*, 862 F.2d 910 (1st Cir. 1988), a compound question combined separate elements in a way which led to ambiguity as to whether the jury found either or both of the elements. Both elements were at issue. Here, in contrast, there was no reason for the jury to decide the subjective expectation question separate from the objective expectation question, in light of the trial court's ruling that if either standard was met, coverage was precluded. Thus, although it cannot be determined whether the jury's verdict was that QCF subjectively, objectively, or both subjectively and objectively expected the leakage into the groundwater, it is obvious that the trial court would have had absolutely no reason to enter any findings on a subjective standard alone. Nor is there any need to "deem" any findings consistent with the judgment.

Patently, this matter was submitted to the jury under the trial court's ruling that an objective standard applied, and under jury instructions that contained the objective standard. There was no waiver within the meaning of CR 49(a) of the right to a jury determination on the subjective standard.

The real question is whether QCF preserved its appeal of the subjective/objective issue. There is no specific rule pertaining to the proper method for objecting to special jury verdict forms. Federal courts have required compliance with Fed. R. Civ. P. 51, requiring timely exceptions to jury instructions, in order to properly preserve an objection to a special verdict question. *Landsman Packing Co. v. Continental Can Co.*, 864 F.2d 721, 726 (11th Cir. 1989); *J.C. Motor Lines, Inc. v. Trailways Bus Sys., Inc.*, 689 F.2d 599, 602 n.2 (5th Cir. 1982).

CR 51(f) provides that counsel must, in objecting to the giving of any instruction, "state distinctly the matter to which he objects and the grounds of his objection". This court and the federal courts agree that the purpose of the requirement is to "sufficiently apprise the trial court of any alleged error in order to afford it the opportunity to correct the matter if necessary". *Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 163, 795 P.2d 1143 (1990).

We agree that CR 51(f) applies by analogy to special verdict forms. However, under some circumstances compliance with the purpose of the rule will excuse technical noncompliance. *See Falk v. Keene Corp.*, 113 Wn.2d 645, 658, 782 P.2d 974 (1989) (holding that an issue concerning an instruction that was not challenged at trial was properly before the court where the party had made his position clear through his objection to the trial court's failure to give one of his proposed instructions); *Crossen v. Skagit Cy.*, 100 Wn.2d 355, 359, 669 P.2d 1244 (1983); *Bennett v. Maloney*, 63 Wn. App. 180, 186, 817 P.2d 868 (1991), *review denied*, 118 Wn.2d 1011 (1992); *cf. Landsman Packing Co. v. Continental Can Co., supra* at 727-28.

In this case, the purpose of the CR 51(f) objection requirement has been met. The issue concerning the applicability of the objective standard was argued pretrial on a motion for summary judgment. Although the trial judge indicated that the matters decided on summary judgment would not be reconsidered during the discussion of jury instructions, QCF still objected to the jury instruction on objective expectation on the grounds that the objective standard was not the applicable standard. The trial judge understood QCF's argument, but was unwilling to reconsider the issue. By objecting to the instruction on objective expectation, QCF gave the trial court adequate opportunity to change both the instruction and the accompanying special verdict question.

As did the Court of Appeals, we conclude that in objecting to jury instruction 4 setting forth the objective standard, QCF sufficiently apprised the trial court of its objection to the objective standard, including that set out in the special verdict form.

### Whether Objective or Subjective Standard Applies[1]

The Maryland Casualty and Central National policies provide for coverage for personal injury and bodily damage caused by or arising out of an "occurrence", which is defined as "an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage . . .". Clerk's Papers (Appellant) vol. 1, at 448, 466, 495, 519.

The dispute focuses on whether expectation is determined by a subjective or objective standard. The Court of Appeals

---

[1]The insurers claim that a number of issues raised by QCF are not properly before the court because they were raised in a Conditional Petition for Review. All of the issues were adequately addressed in QCF's brief in the Court of Appeals, but that court did not address several of the issues because it resolved this case on other grounds. QCF did not seek review by this court of any issues, unless this court granted the insurers' Petitions for Review.

We conclude that certain issues raised in the Conditional Petition for Review are properly before us, and, moreover, the issues set forth in the Conditional Petition for Review should be resolved to promote justice and facilitate the decision of the case on the merits. *See* RAP 1.2(a).

ruled that a subjective standard applies, relying upon *Rodriguez v. Williams*, 107 Wn.2d 381, 729 P.2d 627 (1986). We agree.

We note at the outset that courts in other jurisdictions which have considered this issue in the context of claims for coverage for damage resulting from pollution have split on the question whether the "unexpected and unintended" requirement is determined by a subjective or an objective standard. Some courts hold a subjective standard applies. *E.g., Broderick Inv. Co. v. Hartford Accident & Indem. Co.*, 954 F.2d 601, 606 (10th Cir.), *cert. denied*, 121 L. Ed. 2d 133 (1992); *Hatco Corp. v. W.R. Grace & Co. — Conn.*, 801 F. Supp. 1334 (D.N.J. 1992). Other courts hold that an objective standard applies. *E.g., Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 480 N.W.2d 368 (Minn. Ct. App.), *review denied* (Mar. 26, 1992); *Lane Elec. Coop., Inc. v. Federated Rural Elec. Ins. Corp.*, 114 Or. App. 156, 834 P.2d 502, *review denied*, 314 Or. 727, 843 P.2d 454 (1992). Similarly, comment is split. Commentators state as general rules that expectation and intendment are judged by an objective reasonable man standard, Barry R. Ostrager & Thomas R. Newman, *Insurance Coverage Disputes* § 7.03[c] (4th ed. 1991), and, in contrast, that most courts require an element of subjectivity as opposed to the objective reasonable person standard, Thomas A. Gordon & Roger Westendorf, *Liability Coverage for Toxic Tort, Hazardous Waste Disposal and Other Pollution Exposures*, 25 Idaho L. Rev. 567 (1988-89).

We apply Washington law. Construction of an insurance policy is a question of law for the courts, the policy is construed as a whole, and the policy " 'should be given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.' " *Grange Ins. Co. v. Brosseau*, 113 Wn.2d 91, 95, 776 P.2d 123 (1989) (quoting *Sears v. Grange Ins. Ass'n*, 111 Wn.2d 636, 638, 762 P.2d 1141 (1988)). Undefined terms should be given their plain, ordinary, and popular meaning. *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 881, 784 P.2d 507, 87

A.L.R.4th 405 (1990). The language in standard form policies is interpreted in accord with the understanding of the average purchaser even if the insured is a large corporation with company counsel. *Boeing*, at 882-83.

■■ The policies provide that an occurrence is covered "which *unexpectedly* and *unintentionally* results in" damage. *Queen City Farms*, at 854. The policies do not define the term "unexpectedly", nor do they contain language expressly indicating whether a subjective or objective standard applies. The plain, ordinary, and popular meaning of the term "unexpected" may be said to involve state of mind, but that does not resolve the inquiry whose state of mind — the insured's, or a reasonable person's, as the Court of Appeals noted. *Queen City Farms*, at 855.

However, the average purchaser of insurance would understand that the policy language provides for coverage for damage resulting from most acts of ordinary negligence. As the Court of Appeals in this case recognized, an objective standard is inconsistent with insurance coverage for damage resulting from ordinary negligence. Thus, the driver who intentionally backs a car up, but does so negligently into the path of a vehicle having the right of way, has acted intentionally in a manner where it can be said that objectively an accident may occur. The average purchaser of insurance would reasonably understand from the policy language that coverage was provided under the occurrence clause.

We recognized in *Rodriguez* the difficulty that results if an objective standard were to apply to the "unexpected and unintended" requirement in *Rodriguez*. There, this court was faced with the question whether incest was within the scope of a homeowner's insurance policy exclusion for personal injuries expected or intended by the insured. The court rejected the insurer's argument that objectively if the injury could be expected as the result of an intended act, then it would fall within the exclusion, reasoning that

> [w]hile doubtlessly the average purchaser of insurance would believe that incest would harm a child, the policy specifically states that the insured must expect or intend harm. Thus, the

policy language itself is inconsistent with a blanket objective person standard, and the policy language must control. *Moreover, if an objective standard is used, virtually no intentional act would ever be covered. Intentional acts which result in injury generally can be expected to result in injury. An objective standard, especially provided after the fact, would seem to render meaningless the plain language providing for coverage for certain intentional acts.*

(Italics ours.) Rodriguez, at 386.

In light of public policy considerations, the court held that it did not matter whether the insured subjectively intended the harm, because intent would be found as a matter of law. Nonetheless, the reasoning in the opinion emphasized above is sound.

Because the average purchaser of insurance would understand that coverage is provided for ordinary acts of negligence, the more reasonable construction of the "unexpected and unintended" requirement is that it is determined under a subjective standard.

We recognize that some courts have employed an analysis requiring some higher degree of foreseeability than the reasonable foreseeability applicable to ordinary negligence. *E.g., Carter Lk. v. Aetna Cas. & Sur. Co.*, 604 F.2d 1052, 1057 (8th Cir. 1979) (substantial probability). The insurers urge a test of whether damage was more likely than not to occur; they maintain such a standard will resolve the problem of coverage for ordinary negligence.

We do not find this argument persuasive. Despite the insurers' claim that an objective standard applies, the policy language simply does not set forth such a standard. Nothing in the occurrence clause says that an objective standard applies, nor does it hint at any objective standard which requires some heightened degree of "foreseeability" in applying an objective standard of expectation. As QCF correctly notes, if the insurers wanted an objective standard to apply, they could easily have drafted language to that effect. *See Aetna Cas. & Sur. Co. v. Dichtl*, 78 Ill. App. 3d 970, 398 N.E.2d 582 (1979).[2]

---

[2]We are presented with argument that drafters of the occurrence clause at one time considered inserting an express reasonable person standard into the clause,

We conclude the policy language is at the least ambiguous as to whether an objective or a subjective standard applies. Unresolved ambiguities are resolved against the drafter-insurer and in favor of the insured. *Greer v. Northwestern Nat'l Ins. Co.*, 109 Wn.2d 191, 201, 743 P.2d 1244 (1987). Under this rule, a subjective standard applies, as the insured has offered this reasonable construction of the policy language.

Finally, many of the cases relied upon by the insurers concern the meaning of the term "accident", and not specifically the issue whether expectation of harm should be determined under an objective or subjective standard. The determination of what constitutes an accident, *i.e.*, whether injury or damage has resulted from an "accident", is not dispositive on the standard for expectation of the damages. Thus, this court's holding in *Roller v. Stonewall Ins. Co.*, 115 Wn.2d 679, 801 P.2d 207 (1990), that whether an accident has occurred is an objective determination, does not control the question whether the expectation of injury or damage is to be decided under an objective or subjective standard. Some of the cases relied upon by the insurers involve the rule that an "accident" is an unusual, unexpected and unforeseen happening, and that where the insured acts deliberately, no accident occurs unless there is an additional unexpected, independent and unforeseen happening which caused the harm. *E.g., Grange Ins. Co. v. Brosseau*, 113 Wn.2d 91, 776 P.2d 123 (1989); *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 823 P.2d 499 (1992). Again, these cases do not concern the standard for expectation of the resulting harm.[3]

---

but rejected the idea. The materials relied upon are not in this record. Nevertheless, regardless whether the insurance industry in fact rejected a reasonable person standard, it is clear that had the drafters wanted a reasonable person standard they could have made that intent clear in the language of the clause.

[3]One commentator has suggested that use of the word "foreseeability" has been imprecise in certain of this court's decisions:

"In several cases, Washington courts have used foreseeability analysis in the 'expected or intended' language in liability policies or in construing the term 'accident', which has been defined as 'an unusual, unexpected, and unforeseen

We note, though, that some Court of Appeals cases seem to apply an objective standard of expectation, *e.g., Palouse Seed Co. v. Aetna Ins. Co.*, 40 Wn. App. 119, 697 P.2d 593 (1985); *Medina v. Transamerica Ins. Co.*, 37 Wn. App. 360, 680 P.2d 69, *review denied*, 102 Wn.2d 1004 (1984), and that some language in some of this court's cases may suggest an objective standard. Nevertheless, this court has not previously addressed the issue before us other than in *Rodriguez v. Williams*, 107 Wn.2d 381, 729 P.2d 627 (1986), where the court considered the effect of applying an objective standard.

We conclude that a subjective standard applies, based upon examination of the policy language, the lack of any objective standard set out in the policy (and the ease with which one could have been drafted if that is what the insurers intended), and the meaning which the average purchaser would give to policy language, *i.e.*, that injury or damage resulting from acts of negligence, even though precipitated by an intentional act, would be covered under the occurrence clause.

Finally, in deciding whether an insured subjectively expected or intended the damage, circumstantial evidence is, of course, admissible. One commentator has suggested that the difference between an objective standard and a subjective standard may not be a substantial one:

> Since proof of state of mind normally is indirect or circumstantial, even a subjective test must rely on facts from which an inference about the insured's state of mind must be drawn, such as the obviousness of already-occurring harm.

Kenneth S. Abraham, *Environmental Liability Insurance Law* 134 (1991).

happening.'. . . Since expected damage is always foreseeable, courts may inadvertently use the legal term 'foreseeable' where the evidence of intended or expected damage is strong. . . . While it may be argued that the damage in [such] cases was both expected and foreseeable, courts should not uniformly ask only whether damage was foreseeable when determining whether damage was expected." Robert W. Bryan & John T. Petrie, *"Occurrence" Coverage for Pollution Damage — Searching for the Policyholder's Actual Subjective Expectation*, 28 Gonz. L. Rev. 553, 557 n.19 (1992-1993).

The jury has concluded that QCF neither subjectively nor objectively expected or intended the leakage from the pits into the groundwater prior to December 31, 1968. Thus, it necessarily follows from the jury finding that QCF did not subjectively expect or intend the harm, the groundwater contamination, prior to that date. However, the jury did not determine, solely under a subjective standard, whether the leakage was expected or intended on or after that date. As the Court of Appeals correctly concluded, the insurers presented considerable evidence which tended to show that objectively a reasonable person would have expected the damage. QCF presented considerable evidence that subjectively leakage (and thus resulting damage) was not expected. The factual determination under a subjective standard must be resolved on remand.

### BURDEN OF PROOF

The next question is whether the insured or the insurer bears the burden of proving that the injury or damage was expected or intended. The Court of Appeals upheld the trial court's determination that the insured, QCF, had the burden of proving that damage was neither expected nor intended. QCF argues the insurer bears the burden of proof.

The Court of Appeals' holding is supported by *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wn.2d 901, 726 P.2d 439 (1986). There, an insurance policy provided that there was coverage for an occurrence which resulted in "bodily injury or property damage neither expected [n]or intended from the standpoint of the Insured". *E-Z Loader*, at 904 (quoting policy). The court said that a claim would be covered only if the insured proved the existence of three elements, including that the occurrence resulted in bodily injury neither expected nor intended by the insured. *E-Z Loader*, at 906. The court relied upon the principle that the burden is on the plaintiff to show that a loss falls within the terms of the policy. *Waite v. Aetna Cas. & Sur. Co.*, 77 Wn.2d 850, 853, 467 P.2d 847 (1970), *cited in E-Z Loader*, at

906; *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 731, 837 P.2d 1000 (1992).

To satisfy the "occurrence" definition, and to come within the coverage provision, it must be established that the harm was unexpected or unintended. There is never coverage where the harm is expected or intended.

QCF argues, though, that the insurer should bear the burden of proof under the principle that the insurer bears the burden of proving applicability of exclusions from coverage. *See Aetna Ins. Co. v. Kent*, 12 Wn. App. 442, 447, 530 P.2d 672, *rev'd on other grounds*, 85 Wn.2d 942, 540 P.2d 1383 (1975). QCF points out that while the language "unexpectedly and unintentionally" appears in the "occurrence" definitions of these policies, this court in *Grange Ins. Co. v. Brosseau*, 113 Wn.2d 91, 93, 97, 776 P.2d 123 (1989) considered two policies, one where such language was in the "occurrence" definition and the other where the language was in an exclusion, and termed both "exclusionary".

■ However, the argument that the "unexpected or unintended" language is exclusionary is not a particularly strong argument when deciding who has the burden of proof on this issue, because "virtually all the language in the Insuring Agreement of CGL policies after the insurer's promise to 'pay all sums the insured shall become legally obligated to pay * * *' qualifies or limits the scope of this promise in one way or another." K. Abraham, *Environmental Liability Insurance Law* 140-41 (1991).

> The argument that any limitation on coverage is exclusionary in nature and should be treated as an exclusion is plainly wrong. Under that rationale, literally anything less than the insurer's unconditional promise to pay any amount at any time for any reason and under any circumstances would be an exclusion and the insurer would bear the burden of proof. It would not be necessary for the policyholder to prove anything to bring its claim within the coverage. That argument betrays a fundamental misunderstanding of the logic and organization of an insurance policy. The coverage language defines the set of all claims that are covered. The exclusions define subsets of claims that, although within the main set, are nevertheless excluded. The coverage language specifies a number of factors

that must be present for coverage to exist. That the property damage be "caused by an occurrence" is one of them. It is logical that the policyholder, as claimant, should bear the burden of proof of establishing that its claim is within the coverage of the policy, including that the property damage was caused by an occurrence, and that, once it has done so, the insurer should bear the burden of proof of establishing that the claim is within an exclusion.

Mark N. Thorsrud et al., *Insurance Coverage for Pollution Liability in Washington. What Constitutes an "Occurrence?" The Insurer's Perspective*, 28 Gonz. L. Rev. 579, 604 n.168 (1992-1993).

Moreover, although there is some tension between *E-Z Loader* and *Brosseau*, the court in *Brosseau* did not address the burden of proof issue, but instead the case involved construction of the policy.

Professor Abraham suggests other considerations, including the notion that the burden of proof should be on the insured because the insured is "likely to be in possession of or have greater access to whatever information exists about its expectations or intentions . . . ." Abraham, at 140. This reasoning is compelling in the case where a subjective standard is applied.

In light of the conclusion in *E-Z Loader* that the burden of proof is on the insured to show that injury or damage was not expected or intended because the insured must establish the loss comes within the coverage provision of the policy, and in light of our holding above that a subjective standard for "expected or intended" applies, we conclude the burden of proof should be on the insured to establish that subjectively injury or damage was neither expected nor intended.

The trial court and the Court of Appeals correctly held that QCF had the burden of proof on this issue.

### THE POLLUTION EXCLUSIONS

Central National and Maryland Casualty cross-appealed the trial court's denial of their Motion for Summary Judg-

ment that, as a matter of law, the pollution exclusions found in several policies precluded coverage. The Court of Appeals held that the trial court did not err, reasoning that the pollution exclusions are clarifications, or restatements, of the occurrence clauses. We affirm the Court of Appeals' holding that summary judgment was properly denied, but use somewhat different reasoning.

At the outset we note that the pollution exclusion clauses in standard form policies have generated many appellate decisions. Published opinions may be found which support virtually all of the arguments made by the insurers and the insured in this case, as well as the many amici who have provided briefing. No attempt is made here to catalog all the decisions, nor are all cases supporting a proposition cited. Anyone attempting to research the law in this area will find ample guidance in the primary and secondary sources. Instead, this opinion attempts to explain those cases and authorities which are persuasive on the various issues in light of Washington law and Washington rules for construing insurance contracts.

There are three pollution exclusion clauses at issue. Central National's excess policies contain absolute pollution exclusion clauses but provide in those exclusions that coverage is excluded "except insofar as coverage is available to the Insured in the underlying insurances . . .". Clerk's Papers (Appellants) vol. 2, at 467, 496, 520. Thus, to determine coverage for pollution damage under the Central National policies, it is necessary to examine the relevant coverage and exclusion provisions in the primary policies in place during the same time frame as Central National's policies. Those primary policies contain two of the three pollution exclusion clauses at issue here.

### The "Qualified Pollution Exclusion"

The first of the two pollution exclusions found in the primary policies under Central National's policy is what is commonly known as the "qualified pollution exclusion clause"

found in standard comprehensive general liability (CGL) policies from 1970 to 1986. It provides:

> This insurance does not apply:
>
> . . . .
>
> to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

Clerk's Papers (Appellant) vol. 2, at 140, 267.

The insurers principally argue that as a matter of law the deliberate dumping of waste materials into the pits over many years in the regular course of business is not "accidental", and therefore not "sudden and accidental". Thus, according to the insurers, the exception found in the exclusionary clause which provides (reinstates) coverage where the "discharge, dispersal, release or escape" is "sudden and accidental" is not applicable, and coverage is precluded. The insurers also maintain that disposal of waste materials into the pit was not "sudden" and therefore the exception does not apply.

In addition to the rules of construction set forth above, *e.g.*, construction of policy language is for the court and undefined terms should be given their plain, ordinary, and popular meaning in accord with the understanding of the average purchaser of insurance, an additional rule of construction applies, *i.e.*, exclusions should be construed strictly against the insurer. *Phil Schroeder, Inc. v. Royal Globe Ins. Co.*, 99 Wn.2d 65, 68, 659 P.2d 509 (1983), *modified on reconsideration*, 101 Wn.2d 830, 683 P.2d 186 (1984).

The first step is to examine the language of the policies and construe it as a whole. As noted, coverage for pollution caused damage under the Central National policies is determined by reference to the primary policies under the Central National policies. To decide what is encompassed by the qualified pollution exclusion found in some of the primary policies, we examine the exclusion in context, that is, in light of those primary policies' language as a whole.

Coverage is provided in those policies as follows:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of [bodily injury or property damage] to which this insurance applies, caused by an occurrence . . ..

Clerk's Papers (Appellant) vol. 2, at 140, 267.

> "[O]ccurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured . . ..

Clerk's Papers (Appellant) vol. 2, at 137, 299.

Note that this definition is not exactly the same as that contained in the Central National policies themselves. We are not here concerned with what constitutes an "occurrence" within the meaning of the Central National policies, nor with the objective/subjective standard and burden of proof issues addressed above. We are solely concerned with what the qualified pollution exclusion in certain of the primary policies means, and that question is resolved in part by reference to the rest of the language of the primary policies, including the "occurrence" definition which they contain.

Before the "occurrence"-based policies were written, comprehensive (now commercial) general liability policies were "accident"-based. The standard form "accident" policy did not define the term "accident", and the term became the subject of dispute. Sharon M. Murphy, Note, *The "Sudden and Accidental" Exception to the Pollution Exclusion Clause in Comprehensive General Liability Insurance Policies: The Gordian Knot of Environmental Liability*, 45 Vand. L. Rev. 161, 165 (1992). A number of courts, however, defined the term as an "unintended, sudden, unexpected event," including ongoing events. Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion*, 75 Cornell L. Rev. 610, 623 (1990) (and cases cited therein); Thomas M. Reiter et al., *The Pollution Exclusion Under Ohio Law: Staying the Course*, 59 U. Cinn. L. Rev. 1165, 1188 (1991) (and cases cited therein).

In 1966, the standard form policy was revised to an "occurrence"-based policy. Occurrence was defined in part in the standard CGL policy as "an accident, including injurious exposure to conditions . . ." which resulted in a loss. We agree with one commentator, widely cited, who reasons that under this "new language" the occurrence clause would cover "pollution liability that arose from gradual losses" provided that the loss was unexpected and unintended. E. Joshua Rosenkranz, Note, *The Pollution Exclusion Clause Through the Looking Glass*, 74 Geo. L.J. 1237, 1247 (1986) *quoted in, e.g., Morton Int'l, Inc. v. General Accident Ins. Co. of Am.*, 134 N.J. 1, 32, 629 A.2d 831, 849 (1993); *New Castle Cy. v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1196-97 (3d Cir. 1991). Prior to the addition of the pollution clause, then, the occurrence clause allowed for coverage for losses arising from gradual events, provided that the loss otherwise fell within the "occurrence" definition, particularly that the loss was unexpected and unintended.

The so-called qualified pollution exclusion was added to the standard CGL policy, first as a mandatory endorsement in 1970, and then as part of the policy in 1973. Also in 1973, the occurrence definition was altered to provide that an "occurrence" is " 'an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.' " Robert M. Tyler, Jr. & Todd J. Wilcox, *Pollution Exclusion Clauses: Problems in Interpretation and Application Under the Comprehensive General Liability Policy*, 17 Idaho L. Rev. 497, 499 (1981). This definition is the one found in certain of the primary policies underlying the Central National policies in this case. As can be seen, this definition clearly contemplates gradual events.

What did the pollution exclusion do, if anything, to change coverage for damage resulting from gradual pollution where the injury or damage was neither expected nor intended?

The qualified pollution exclusion contains both an exclusion and an exception to the exclusion. Coverage is excluded

for damage "arising out of the discharge, dispersal, release or escape" of pollutants or contaminants. The exception is found in the last clause of the exclusion, where coverage is nonetheless provided "if such discharge, dispersal, release or escape is sudden and accidental".

None of these terms in the qualified pollution exclusion is defined in the policy. Thus, they are to be interpreted in accord with the understanding of the average purchaser of insurance, and the terms are to be given their plain, ordinary and popular meaning. That meaning may be ascertained by reference to standard English dictionaries. *Estate of Jordan v. Hartford Accident & Indem. Co.*, 120 Wn.2d 490, 502, 844 P.2d 403 (1993); *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 877, 784 P.2d 507, 87 A.L.R.4th 405 (1990).

First looking to the exclusionary language, the damage must "arise out of" certain listed conditions. "Arise out of" is commonly understood to mean originating from a specific source, *Webster's Third New International Dictionary* 117 (1986), and we conclude that is what the average purchaser of insurance would understand it to mean. The originating source of the damage must be the "discharge, dispersal, release or escape" of pollutants or contaminants. Thus, the exclusion focuses on certain damage-causing events.

QCF urges the court to focus on the leakage from the pits, and not the initial disposal into the pits. The insurers urge the court to focus on the initial disposal into the pits.

The terms "discharge, dispersal, release or escape" are not defined. "Discharge" appears to encompass acts of disposing of wastes into waste pits. The exclusion refers to the discharge, dispersal, release or escape "into or upon land . . .". One construction of the language is that it includes the dumping of the wastes "upon" the land, *i.e.*, in this case upon the ground of the natural depression and later, the constructed pits separated by berms.

However, the terms "discharge", "dispersal", "release", and "escape", have plain, ordinary, popular meanings which indi-

cate that the initial disposal into the pits is not the relevant event. "Discharge" has as one meaning "to give outlet to : pour forth", and "a flowing or issuing out . . .". *Webster's*, at 644. This definition may apply to mean the release from the pits. "Dispersal" is "the act or result of dispersing". *Webster's*, at 653. "Disperse" includes the meaning "to spread or distribute from a fixed or constant source . . .". *Webster's*, at 653. "Escape" is "the act of escaping or the fact of having escaped: as . . . leakage or outflow esp. of steam or a liquid . . .". *Webster's*, at 774. "Release" includes "to set free from restraint, confinement, or servitude . . ." and a "discharge from restraint . . .". *Webster's*, at 1917.

These are not the only dictionary definitions, but they are popular meanings which have in common the notion of an escape or release from confinement, or the dispersal from a fixed place. They apply well to the migration of the wastes from the pits into the groundwater. They do not apply well to disposal into the pits.

In construing the policies, we are concerned with what the average purchaser would understand the terms to mean. In this regard, it is important that these policies are comprehensive general liability policies, and the average purchaser would expect broad coverage for liability arising from business operations. It is easy, from the vantage point of time passed, to recognize the environmental dangers and costs of disposing of hazardous wastes into landfills and the like.

However, as one court has aptly explained:

> When landfills began to be licensed in the late 1960s and early 1970s, landfill operators and even many environmental officials expected the design of a landfill would function to contain pollutants. In particular, the soil beneath landfills was expected to act as a filter to prevent pollutants from migrating into the underlying and surrounding ground and surface waters. Since landfills were expected and intended to contain any wastes placed in them, pollutants deposited in a landfill could only cause property damage if there was a "discharge, dispersal, release or escape" of those pollutants from the landfill into the surrounding environment. Thus, the deposit of pollutants into a landfill cannot be the triggering event; rather, the "escape" is the critical inquiry for purposes of determining the applicability of the pollution exclusion.

The language of the pollution exclusion itself supports our interpretation. Both the exclusion and its exception apply to a "discharge, dispersal, release or escape" of pollutants. All of these terms carry the connotation of the issuance of a substance from a state of containment; none of the terms is normally used to describe the placement of a substance into an area of confinement.

(Footnote and citations omitted.) *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 480 N.W.2d 368, 373-74 (Minn. Ct. App.), *review denied* (Mar. 26, 1992); *see also New Castle Cy. v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1167 (3d Cir. 1991) (noting that in the late 1960's little was known about environmental danger posed by sanitary landfills; few recognized the extent to which landfills threatened pollution of groundwater).

■■■ The technology and understanding of the safety and containment characteristics of waste disposal sites then and now are far different. It seems to us that an average purchaser of insurance in earlier years would have been justified in thinking that there was coverage for the placement of wastes into a waste pit, or a landfill, which was expected to contain the wastes and from which it was not expected that they would discharge, disperse, release, or escape into the groundwater, or from which it was believed that the waste materials would be safely filtered. That is, the average purchaser of insurance would have understood that mere placement of wastes into a place which was thought would contain or filter the wastes would not have been an event which would fall within the exclusion. We therefore hold that the relevant polluting event is the discharge, dispersal, release, or escape of toxic material into the environment, and where material has been deposited in a place which was believed would contain or safely filter the material, such as a waste disposal pit or sanitary landfill, the polluting event is the discharge, dispersal, release, or escape from that place of containment into or upon the land, the air or water, including groundwater.

A determination that a polluting event has occurred does not end the inquiry. The exception to the exclusion, found in

the last clause of the exclusion, retriggers coverage if the polluting event is "sudden and accidental". The first point about this language is that it is the same discharge, dispersal, release, or escape ("*such* discharge, dispersal, release or escape") as that out of which the damage arises. The second point is that the discharge, dispersal, release, or escape must be sudden and accidental. Thus, reading the exclusion and the exception together, only damage causing discharges, dispersals, releases, or escapes which are non-sudden and nonaccidental are excluded from coverage.

The terms "sudden and accidental" have been the subject of enormous debate, which primarily centers on the word "sudden". There is, however, wide recognition that various dictionaries define the word "sudden" both as "unexpected", and in terms connoting a temporal idea of abrupt, instantaneous, short in duration, or the like. *See generally*, Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion*, 75 Cornell L. Rev. 610, 614 n.9 (1990) (summarizing numerous dictionary definitions).

A number of courts have noted the two common, reasonable meanings of sudden, as "unexpected" and as meaning abrupt, quick, or of short duration, instantaneous or the like, and have concluded the term is ambiguous in the context of the qualified pollution exclusion. *E.g., New Castle Cy.*, at 1193-95; *Claussen v. Aetna Cas. & Sur. Co.*, 259 Ga. 333, 335, 380 S.E.2d 686, 688 (1989); *Just v. Land Reclamation, Ltd.*, 155 Wis. 2d 737, 746, 157 Wis. 2d 507, 456 N.W.2d 570, 573 (1990).

This court, too, has noted the two reasonable meanings of the word "sudden", albeit in the context of a boiler and machinery insurance policy. In *Anderson & Middleton Lumber Co. v. Lumbermen's Mut. Cas. Co.*, 53 Wn.2d 404, 333 P.2d 938, 34 A.L.R. 731 (1959), the issue was whether there was coverage under a policy which provided coverage if a loss was caused by an "accident", which was "defined as the sudden and accidental breaking of the bandsaw wheel, or

any part thereof, into two or more separate parts while it was in use or connected for use." *Anderson*, at 405.

The court began with the general rules that insurance policy language generally must be construed according to its ordinary meaning, and where ambiguity exists, it should be construed in favor of the insured and against the insurer/drafter. *Anderson*, at 405-06. The court then reasoned that

> [t]he word "sudden" is defined in Funk & Wagnalls Standard Dictionary of the English Language as, "happening quickly and without warning; coming unexpectedly or in an instant; as *sudden* death; *sudden* dismissal." In Webster's New International Dictionary (2d ed.), it is defined: "Happening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for; as, a *sudden* shower, death, emergency, turn for the better, or attack of the enemy."
>
> The purpose of the contract was to insure the respondent against an accidental breakdown of the equipment covered by the policy. The word "sudden" was, of course, placed in the contract for a purpose. Is it more reasonable to assume that it was placed there to show an intent to exclude coverage of a break which did not happen instantaneously, or to exclude coverage of a break which was unforeseen and therefore unavoidable? It seems to us that the risk to the insurer would be the same, whether a break was instantaneous or began with a crack which developed over a period of time until the final cleavage occurred, as long as its progress was undetectible. On the other hand, the insured should not be permitted to proceed recklessly and hold the insurer liable for damage if it had been forewarned of a possible break and could have taken steps to forestall it or avoid an interruption of business resulting therefrom.
>
> . . . [The court does not construe the word as instantaneous] when its primary meaning, in common usage, is not "instantaneous" but rather "unforeseen and unexpected."

*Anderson*, at 408-09.

While the insurers here argue that in other contexts the term "sudden", has been given a temporal meaning, we conclude that the reasoning in *Anderson* is as sound in the context of these policies as it was in the policy at issue in that case. That the term "sudden" may sometimes be unambiguous depending upon context does not mean it always must be given one, and only one, meaning.

The insurers maintain, however, that in context the term here is unambiguous because for the word "accidental" to have independent effect, "sudden" must mean something other than unexpected because "accidental" has at least that quality. A number of courts have followed this reasoning. *E.g., Aetna Cas. & Sur. Co. v. General Dynamics Corp.*, 968 F.2d 707 (8th Cir. 1992); *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 480 N.W.2d 368, 376 (Minn. Ct. App.), *review denied* (Mar. 26, 1992); *Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc.*, 407 Mass. 675, 680, 555 N.E.2d 568, 572 (1990).

We do not agree that the term is unambiguous in the context of these policies. First, the same language, "sudden and accidental", was involved in *Anderson*. Second, "accidental" has independent effect as "unintended". *See New Castle Cy.*, at 1194. Moreover, as the court in *New Castle Cy.* appropriately observed, insurance policies often use words which have similar meanings, such as in the qualified pollution exclusion where the words "discharge, dispersal, release or escape" are all used to describe possible polluting events. *New Castle Cy.*, at 1194.

Thus, we hold the term "sudden" is ambiguous. Under our general rules for construing insurance policies, ambiguity in a policy may be resolved through extrinsic evidence as to the parties' intent. *American Star Ins. Co. v. Grice*, 121 Wn.2d 869, 874, 854 P.2d 622 (1993), *opinion supplemented*, 123 Wn.2d 131, 865 P.2d 507 (1994). However, no extrinsic evidence as to the parties' intent is in this record. Moreover, while evidence of the parties' mutual intent may be helpful in some contexts, we have recognized that sometimes language in standard policies does not involve mutual negotiations between the insurers and the insureds. In *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 883, 784 P.2d 507, 87 A.L.R.4th 405 (1990), we observed the term "as damages" found in standard CGL policies was selected by the insurer and was not negotiated. Similarly, as the New Jersey Supreme Court noted, the qualified pollution exclusion was

drafted by the insurance industry; there was no participation by insureds in the drafting of the clause. *Morton Int'l, Inc. v. General Accident Ins. Co. of Am.*, 134 N.J. 1, 37, 629 A.2d 831, 851-52 (1993), *cert. denied*, 114 S. Ct. 2764 (1994).

Thus, we are left with ambiguity in a nonnegotiated standard form insurance provision. Unresolved ambiguity in insurance contract language is resolved against the insurer. *Greer v. Northwestern Nat'l Ins. Co.*, 109 Wn.2d 191, 201, 743 P.2d 1244 (1987). Where exceptions to or limitations upon coverage are concerned, this principle applies with added force. *Greer*, at 201. We thus construe the ambiguity in the pollution exclusion against the drafter-insurer, and in accord with a reasonable interpretation of the policy language.

QCF argues that a reasonable interpretation of the ambiguous pollution exclusion is that "sudden and accidental" means "unexpected and unintended", and that the focus of the exclusion is on the resulting damage. For this interpretation, QCF relies in part upon certain history of the clause.

A number of courts have examined the drafting and marketing history of the qualified pollution exclusion in interpreting the clause. The Court of Appeals in this case relied in part upon an article chronicling certain of the drafting and marketing history of the pollution exclusion clause. *Queen City Farms, Inc. v. Central Nat'l Ins. Co.*, 64 Wn. App. 838, 879-80, 827 P.2d 1024 (1992) (quoting S. Bradbury, *Original Intent, Revisionism, and the Meaning of the CGL Policies*, 1 Envt'l Claims J. 279, 282-83, 285 (1989)). The insurers maintain the court did so improperly, as no evidence of the history is found in the record, and in any event it is, the insurers argue, irrelevant to the parties' mutual intent about the meaning of the clause, as there is no evidence about what QCF intended the exclusion to mean. QCF counters by arguing that the history should not be considered as evidence of the parties' intent, but instead should be considered as one reasonable interpretation of the ambiguous exclusionary language.

As reported in published decisions, representations were made to state insurance regulators that the pollution exclu-

sion was intended to exclude coverage for intentional polluters and clarify the occurrence clause. For example, in *Claussen v. Aetna Cas. & Sur. Co.*, 259 Ga. 333, 337, 380 S.E.2d 686 (1989), the court noted that

> [d]ocuments presented by the Insurance Rating Board (which represents the industry and on which Aetna participated) to the [Georgia] Insurance Commissioner when the "pollution exclusion" was first adopted suggest that the clause was intended to exclude only intentional polluters. The Insurance Rating Board represented "the impact of the [pollution exclusion clause] on the vast majority of risks would be not changed."

(Citation omitted.) *Claussen*, at 337.

In West Virginia, the insurance commissioner held hearings to consider whether to approve inclusion of the proposed exclusionary language in policies in that state. As the Supreme Court of Appeals in West Virginia explained,

> in conjunction with the submissions [of the exclusion language], the Insurance Rating Board and apparently also the Mutual Insurance Rating Board, acting on behalf of their members and subscribers . . . included with their submission of the proposed exclusion language an explanation which stated:
>
> > Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion [the exclusion which is in issue in the present case] clarifies this situation so as to avoid any question of intent. Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident . . .
>
> In this Court's view, the insurance industry thus represented to the State of West Virginia, acting through the West Virginia Commissioner of Insurance, that the exclusion which is in issue in the present case merely clarified the pre-existing "occurrence" clause.

*Joy Technologies, Inc. v. Liberty Mut. Ins. Co.*, 187 W. Va. 742, 747-48, 421 S.E.2d 493 (1992).

In New Jersey, the court also noted similar representations made to state regulators, and refused to give effect to the literal language of the exclusion, which the court construed as a restriction of coverage. Because, the court reasoned, the insurers misrepresented the clause as merely

clarifying the occurrence clause, the court applied an estoppel theory, saying,

> [a]s a matter of equity and fairness, the insurance industry should be bound by the representations of the IRB, its designated agent, in presenting the pollution-exclusion clause to state regulators.

*Morton Int'l, Inc. v. General Accident Ins. Co. of Am.*, 134 N.J. 1, 75-76, 629 A.2d 831, 874 (1993), *cert. denied*, 114 S. Ct. 2764 (1994). The court concluded:

> [W]e hold that, notwithstanding the literal terms of the standard pollution-exclusion clause, that clause will be construed to provide coverage identical with that provided under the prior occurrence-based policy, except that the clause will be interpreted to preclude coverage in cases in which the *insured* intentionally discharges a known pollutant, irrespective of whether the resulting property damage was intended or expected.

*Morton Int'l, Inc.*, at 78.

Other courts have also examined the history of the clause in interpreting the qualified pollution exclusion. *E.g., New Castle Cy. v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1196-98 (3d Cir. 1991); *Just v. Land Reclamation, Ltd.*, 155 Wis. 2d 737, 157 Wis. 2d 507, 456 N.W.2d 570 (1990).

 We agree with QCF that the insurance industry statements examined by these courts may be considered insofar as they represent a reasonable construction of the ambiguous policy language.

> [W]hen the issue is how to interpret an ambiguous policy provision, if the interpretation proposed by the insured came from the mouth of the drafter of the provision, ordinarily this would be some evidence that the proposed interpretation is reasonable.
>
> The argument for admitting at least certain forms of post-promulgation evidence is stronger. Typically the organization that has promulgated a standard-form policy (usually ISO) then files the policy for approval by the Insurance Commissioners in the states where the policy is to be marketed. Explanatory statements made in support of the application for approval are not those of an individual in the course of a deliberative drafting process, but of an agent of all the insurance companies who subsequently issue the policy or endorsement in question. The most celebrated example of such a statement involves the filing

of the "pollution exclusion" with various state Insurance Commissioners in 1970. In such a setting statements by an insurance industry agent interpreting or clarifying the meaning of particular insurance policy provisions might resemble Committee Reports in the legislative setting. That is, such stat[e]ments might be taken to state a collective judgment by the drafters that is not binding but is highly indicative of the intentions of many of those who vote in favor of the legislation, although the precise setting in which the statements were made and the scope of authority of their maker would also seem relevant. *In any event, where the policyholder's burden is merely to show that its interpretation of an ambiguous provision is but one reasonable interpretation, evidence that the interpretation subscribed to by at least some of the drafters was the same as or similar to the policyholder's proposed interpretation would seem relevant.*

(Footnote omitted. Italics ours.) Kenneth S. Abraham, *Environmental Liability Insurance Law* 38-39 (1991).

In reaching our conclusion that the reported representations of the insurance industry to state regulators may be considered insofar as they present a reasonable interpretation of the policy language, we do not treat the statements as extrinsic evidence of the parties' intent. As explained above, there is no evidence of the parties' mutual intent in this record. However, where unresolved ambiguity exists in an insurance provision, the insured is entitled to bring before the court any reasonable construction of the policy language favorable to the insured. That the particular construction happens to be one which courts have identified in published decisions as representations from the insurance industry advanced when approval of the exclusionary language was sought does not preclude our consideration of the particular construction. Nor is there any impropriety in considering a construction based upon representations which the insurers do not dispute was in fact made in some states.

■■ In accordance with the historical explanation recited in the cases, that the clause clarified coverage, "sudden and accidental" means "unexpected and unintended". That is, for injury or damage to be covered under the occurrence clause, it must be neither expected nor intended. Gradual polluting events may fall within the occurrence

clause provided they result in unexpected and unintended damage. Like the inquiry as to whether there was a covered event under the occurrence clause, the inquiry under the qualified pollution exclusion is whether there was a discharge, dispersal, release, or escape of pollutants or contaminants upon the land or into the air or water which resulted in damage (the exclusionary portion of the clause), and, if so, was that discharge, dispersal, release, or escape unexpected, unforeseen, and unintended (the exception)? Expected or intended damage (under the occurrence clause) or expected or intended polluting events (under the pollution exclusion) resulting in damage are not covered. Coverage is otherwise provided.

Thus, similar to the occurrence clause, the pollution exclusion is aimed at precluding coverage for damage resulting from intentional pollution or pollution which is expected.

This coordination of the meaning of the occurrence clause and the exclusion was recognized by the Court of Appeals in *United Pac. Ins. Co. v. Van's Westlake Union, Inc.*, 34 Wn. App. 708, 664 P.2d 1262, 39 A.L.R.4th 1040, *review denied*, 100 Wn.2d 1018 (1983), though we acknowledge that some of the reasoning there differs from ours. In *Van's Westlake Union*, large quantities of gasoline leaked for several months from a small hole in an underground gasoline pipe at a service station. When the leak was discovered, the station was closed and, along with several surrounding blocks, it was cordoned off for several weeks while gasoline was pumped out of the ground. A number of surrounding businesses made claims for loss of profits and similar damage resulting from closure of the area. The claims were tendered to the insurer of the station, which declined to defend or pay. The insurer brought a declaratory judgment action to determine what, if any, its obligations were. The insurer relied upon the qualified pollution exclusion as precluding coverage.

The court in *Van's Westlake Union* reasoned that because neither the escape of the gasoline nor the resulting damage was expected or intended, the qualified pollution exclusion

did not apply to preclude coverage. That conclusion is sound under our reasoning here.

However, in one respect we find that the explanation of the insurance industry relied upon by QCF would lead to an unreasonable construction of the exclusion. That is, QCF argues that the focus of the exclusion is on the damage and not the polluting event. As we have discussed at some length above, the language of the exclusion involves the polluting event, and not the resultant damages. The vast majority of courts agree, including those which otherwise find the exclusion ambiguous, as we have. *E.g., New Castle Cy. v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1199 (3d Cir. 1991) (while finding pollution exclusion ambiguous, nevertheless reasons clear that focus is on discharge and not damages); *Claussen v. Aetna Cas. & Sur. Co.*, 259 Ga. 333, 336, 380 S.E.2d 686, 688-89 (1989) (same); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992) (same); *United States Fid. & Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31, 34 (6th Cir. 1988); *Borden, Inc. v. Affiliated FM Ins. Co.*, 682 F. Supp. 927, 930 (S.D. Ohio 1987), *aff'd*, 865 F.2d 1267 (6th Cir.), *cert. denied*, 493 U.S. 817 (1989); *Hartford Accident & Indem. Co. v. U.S. Fid. & Guar. Co.*, 962 F.2d 1484, 1490 (10th Cir.) (under Utah law), *cert. denied*, 121 L. Ed. 2d 335 (1992); *Technicon Elecs. Corp. v. American Home Assur. Co.*, 74 N.Y.2d 66, 542 N.E.2d 1048 (1989); *Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc.*, 407 Mass. 675, 679, 555 N.E.2d 568, 571 (1990); *Mays v. Transamerica Ins. Co.*, 103 Or. App. 578, 799 P.2d 653 (1990), *review denied*, 311 Or. 150 (1991); *Oklahoma Pub'g Co. v. Kansas City Fire & Marine Ins. Co.*, 805 F. Supp. 905, 910 (W.D. Okla. 1992); *but see, e.g., Just v. Land Reclamation, Ltd.*, 155 Wis. 2d 737, 157 Wis. 2d 507, 456 N.W.2d 570 (1990). The court in *Van's Westlake Union* also appears to have focused on damages; however, it also discussed the question whether the escape of the gasoline was expected or intended.

Because the focus of the exclusion is on the polluting event, and not the damages, we conclude the construction

offered by QCF as advanced by the insurance industry and described in published appellate court decisions is not reasonable insofar as it focuses only on damage resulting from the polluting event. *See* Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion*, 75 Cornell L. Rev. 610, 626 (1990) (observing that the standard explanatory memorandum of the insurance industry ignores the fact that the exclusion refers to the release of pollutants and not the damage caused by such releases).

Moreover, if all the exclusion did was restate the occurrence clause, that is, if it were wholly coextensive, it would be ineffective as an exclusion. In contrast, giving effect to the language of the pollution exclusion which focuses on the polluting event also results in giving some independent effect to the exclusion. *See McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 734, 837 P.2d 1000 (1992) (an insurance policy should be interpreted so as to give effect to each provision).

We note that because we conclude that the relevant polluting event may be the discharge, dispersal, release, or escape of material from a landfill or similar place of containment, the damage/discharge distinction may be insignificant in many cases as a practical matter. The distinction nonetheless serves a valid purpose, however, as explained by the Third Circuit:

> Our first hypothetical city is insured for all unexpected pollution *damage*. Although it expects its landfill to discharge leachate into the environment, it does not expect the leachate to cause any appreciable property damage. Because this city is insured if any unexpected damage results, it has no incentive to improve the design or operation of its landfill. The second city, on the other hand, is insured only for pollution damage that arises from an unexpected *discharge* of pollutants. Therefore, if this city knows that its landfill is discharging leachates, it is not insured for any ensuing property damage, regardless of whether the damage is expected or not. Given that it would not be covered for any consequential damage, the second city, once it realizes that its landfill is discharging pollutants, has a

strong incentive to take precautions designed to minimize the risk of environmental damage.

*New Castle Cy. v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1202 (3d Cir. 1991).

Finally, QCF urges that only "active polluters" fall within the exclusionary language. We reject the "active polluter" terminology urged by QCF, which argues that coverage is excluded only for "active polluters". Such language is not found in the policy, and adds nothing to the analysis. *See Federal Ins. Co. v. Susquehanna Broadcasting Co.*, 727 F. Supp. 169, 177 (M.D. Pa. 1989) (quoting *Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp.*, 702 F. Supp. 1317, 1325 (E.D. Mich. 1988), *modified in part*, 738 F. Supp. 896 (1990), *aff'd*, 928 F.2d 1131 (3d Cir.), *cert. denied*, 116 L. Ed. 2d 58 (1991).

While the Court of Appeals used this term in *Van's West-lake Union*, it did so in light of then sound case law. In any case, while the term itself adds nothing to the analysis, the underlying premise has merit. That is, the court in *Van's Westlake Union* reasoned that an "active polluter" is not found where the polluting event and the resulting damage were neither expected nor intended — and thus coverage would be found. This result accords with our analysis here. If the damage is expected or intended, there is no coverage under the occurrence clause. If the polluting event is expected or intended, then coverage is excluded under the qualified pollution exclusion.

We hold that "sudden" means "unexpected" in the context of CGL policies containing the qualified pollution exclusion. Thus "sudden and accidental" means "unexpected and unintended". Both terms are given meaningful effect. Reading the occurrence clause and the exclusion together, pollution damage resulting from an accident, including continuous or repeated exposure to conditions, which is neither intended nor expected is covered under the occurrence clause. The exclusionary language of the qualified pollution exclusion precludes coverage for damage resulting from the listed pol-

luting events. The polluting event may be the discharge, dispersal, release, or escape of materials from a place of containment into the environment where they cause damage. Coverage is retriggered, however, under the exception to the exclusion, where the discharge, dispersal, release, or escape is sudden and accidental, *i.e.*, unexpected and unintended. Therefore, if the damage results from the dispersal of materials into the groundwater from a place of containment where the insured believed they would remain or from which they would be safely filtered, and that dispersal was unexpected and unintended, then coverage is provided under the policies.

Our conclusion, drawn primarily from the language of the policies, is reinforced by the proposition that when a judicial construction is placed upon words or phrases prior to the issuance of a policy which uses those words and phrases, it is presumed that construction is intended by the parties. 2 George J. Couch, *Insurance* § 15:20, at 195-96 (2d ed. rev. vol. 1984). The term "sudden and accidental" was construed in *Anderson & Middleton Lumber Co. v. Lumbermen's Mut. Cas. Co.*, 53 Wn.2d 404, 333 P.2d 938, 34 A.L.R. 731 (1959), before these policies were issued, and sudden was construed to mean "unexpected". *See Time Oil Co. v. Cigna Property & Cas. Ins. Co.*, 743 F. Supp. 1400, 1408 (W.D. Wash. 1990) (Washington law is settled that "sudden" in the context of an insurance exclusion does not have a temporal meaning). It is thus presumed that the parties intended the term to mean "unexpected". *See also* Carl A. Salisbury, *Pollution Liability Insurance Coverage, the Standard-Form Pollution Exclusion, and the Insurance Industry: A Case Study in Collective Amnesia*, 21 Envt'l L. 357, 381 (1991) ("[p]rior to the . . . drafting of the standard pollution exclusion, the phrase 'sudden and accidental' had been used in insurance policies and repeatedly interpreted by various courts to mean 'unexpected' ").

In summary, we conclude the qualified pollution exclusion is ambiguous. Resolving the ambiguity favorably to the in-

sured and coverage, and against the insurer, we agree that a reasonable construction of the policy language is that damage resulting from one of the named polluting events is not covered, unless that polluting event was unexpected and unintended. Where the facts establish that materials were placed into a waste disposal site which was believed would contain or safely filter them, but, in fact, the materials unexpectedly and unintentionally are discharged or released into the environment, or disperse or escape into the environment, there is coverage for the resulting damage. Under such a scenario, the exception to the exclusion would apply: The discharge, dispersal, release or escape would be sudden and accidental and therefore coverage would be afforded.

Here, the answers to special jury verdict questions resolve this factual question for part of the relevant period. Question 2 on the special verdict form asked: "Did there come a time . . . that Queen City Farms expected or intended, or should reasonably have expected, that materials would leak from its disposal ponds into groundwater?" Clerk's Papers (Appellant) vol. 4, at 1132. As we have held above, this question is improper insofar as it contains an objective standard for QCF's expectation of damage. It nevertheless answers the coverage question for the period up to December 31, 1968, because the jury said that QCF neither subjectively nor objectively expected or intended the leakage from the pits (the polluting event) until that time. As noted, it necessarily follows from this finding that QCF expected and intended that the waste pits would contain or safely filter the material.

On and after that date, however, factual questions remain. Our reasoning above that whether damage was expected or intended is a subjective determination applies equally to the determination whether the escape of material from pits was expected or intended. As with the occurrence clauses discussed in connection with the subjective/objective issue, nothing in the qualified pollution exclusion indicates which standard applies. We construe the resulting ambiguity favorably to the insured, and apply a subjective standard. The

trier of fact must determine whether QCF subjectively expected the materials to be contained by the pits, or, conversely, whether QCF subjectively expected or intended that the materials would leak from the pits into the groundwater. As noted, we agree with the Court of Appeals that the record contains a great deal of evidence which would tend to show that objectively leakage was to be expected. Whether the jury would have reached the same conclusion, that leakage was expected or intended as of December 31, 1968, under a subjective standard, is simply not clear from this record. Remand for resolution of this factual question is necessary.

Finally, we point out that the intentional polluter, or the polluter that dumps materials into landfills or waste disposal sites while knowing or expecting that materials will migrate or disperse into the environment, will not find coverage under the standard CGL policies containing the qualified pollution exclusion. The pollution exclusion with its exception thus serves the obvious policy purpose of precluding coverage for damage resulting from expected and intended pollution. As one commentator has explained:

> The public and regulatory objective of general liability insurance is to transfer the risk of certain types of business-related losses that could threaten insureds' viability. In other words, from a public and regulatory point of view, CGL insurance is designed to promote business stability.

> At the same time, the types of losses that insurance covers must be limited so that insurance companies survive and can continue to serve their function of providing economic stability to their insureds. Generally, the limitations on insurance coverage fall into two categories: expected losses and intentional losses. Expected losses frequently are not covered by insurance because they are more like business expenses than true risks; these losses can be predicted and calculated in the course of responsible business planning efforts. Intentional losses also are not true risks because the insured has the ability to avoid them. Furthermore, public policy forbids the transfer of liability for certain intentional losses.

> An interpretation of [the qualified pollution exclusion] which provides coverage for unanticipated and unintended releases of pollutants is consistent with well-settled insurance risk transfer principles and the twin goals of encouraging responsible business practices and providing business stability. Thus, it is

not surprising that the adoption of [the exclusion] was promoted by the insurance industry, the regulatory community, [and] the public . . ..

(Footnotes omitted.) Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion,* 75 Cornell L. Rev. 610, 628 (1990).

### Other Pollution Exclusions

The other two pollution exclusions at issue include a pollution exclusion found in other primary policies under the Central National policy, and a pollution exclusion in the Maryland Casualty policy. The second pollution exclusion in the primary policies under the Central National policies excludes coverage for bodily injury or property damage "caused by or resulting from the discharge of matter . . . on or into water, land[,] air or any other real or personal property" but not "if the discharge is sudden, unexpected, unintentional". "Discharge of matter" includes "release, spillage, leakage or by means of dumping, emptying, pumping or due to failure of any equipment or resulting from any other source or cause whatsoever". Clerk's Papers (Appellant) vol. 2, at 222, 250.

The Maryland Casualty policy excludes coverage for damage to property and cleanup costs "caused by seepage, pollution or contamination" but not where "such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening". Clerk's Papers (Appellant) vol. 2, at 460.

All of these policies contain the word "sudden", which, as noted above, may be susceptible to more than one reasonable meaning. However, each of these pollution exclusions also expressly provides the polluting event must be "unexpected". Because the word "unexpected" is used in the excepting language, it would render "sudden" superfluous to interpret it as meaning "unexpected".

However, reading "sudden" as having a temporal meaning, like beginning abruptly, or occurring over a short period of time, or instantaneous, also leads to problems in constru-

ing the language. In each of the exclusions there are words suggesting a gradual release or discharge, *i.e.*, "leakage" and "seepage". It does not make sense to speak of an abrupt, instantaneous seepage or leakage, nor of seepage or leakage occurring over a short period of time.

Thus, reading "sudden" as either having a temporal nature or as meaning "unexpected" leads to confusing and inconsistent meanings of the policy language.

We conclude, as did the Court of Appeals, that these exclusions are ambiguous, and therefore should be construed against the drafter-insurer, to mean that if the polluting event is unexpected and unintended, coverage is provided.

As with the qualified pollution exclusion clause discussed above, there is the further question about what constitutes the relevant polluting event. In the case of the primary policies under the Central National policy, the event is the discharge on or into land, water or air. "Discharge" is defined in the policy as the "emission of matter", through, among other things, "its release, spillage, leakage or by means of dumping, emptying [or] pumping". Clerk's Papers (Appellant) vol. 2, at 222. "Release" and "leakage" may obviously pertain to migration of contaminants from a waste disposal site or a sanitary landfill. The policy language is ambiguous as to whether the "leakage" of materials from a waste disposal pit or the initial dumping into the pit is the relevant event. In accord with the rules for construing ambiguity, including the evident purpose of the policy to provide coverage unless damage arises from expected or intended pollution, we construe the clause against the drafter-insurer to mean the relevant polluting event is the release or escape of materials from a waste pit which is intended and expected to contain the material. Although "dumping" is listed as a polluting event, "dumping" may be given effect in accord with our holding in that "dumping" may pertain to the indiscriminate depositing of hazardous materials on land which does not constitute a disposal site expected and intended to contain waste materials.

In the Maryland Casualty policy, "seepage, pollution or contamination" also may be construed to mean the escape of the contaminants from the pit. Like the other exclusions at issue, the clause is ambiguous as to the relevant event. We conclude the clause should be construed to mean the escape of materials from a waste disposal site expected and intended to contain the materials.

The jury has determined that the leakage was expected and intended as of December 31, 1968, and thereafter; however, it did so under an objective standard. Remand is necessary for determination of if and when leakage was subjectively expected and intended.

## MISREPRESENTATION ISSUES

In their answers to the complaint, Lloyd's and Central National each asserted that QCF made material misrepresentations in obtaining insurance coverage. QCF moved to dismiss the misrepresentation defenses on the basis that Lloyd's and Central National had waived the right to assert the defenses because they had not timely tendered back any premiums to QCF after learning of the alleged misrepresentations. The trial court denied the motion to dismiss and allowed the misrepresentation defenses to go to the jury. The jury was instructed that the insurers had the burden of proving by clear, cogent, and convincing evidence that misrepresentations which were material to the issuance of the insurance were made in connection with the policies with the intent to deceive the insurers. Instructions 7, 8; Clerk's Papers (Appellant) vol. 4, at 1119, 1120. The jury returned a verdict in favor of Lloyd's and Central National on the issue.

The Court of Appeals reversed, holding that lack of timely tender precluded the misrepresentation defenses under *Neat v. United States Fid. & Guar. Co.*, 170 Wash. 625, 17 P.2d 32 (1932) and *Glandon v. Searle*, 68 Wn.2d 199, 412 P.2d 116 (1966). The court expressed doubt as to the continued viability of the holdings in those cases, however. We reverse the Court of Appeals, but do not reach the tender issue because

we hold, for other reasons, that the misrepresentation defenses fail.

We first address a challenge to Central National's misrepresentation defense. QCF argues that its motion for a judgment n.o.v. on the issue of the misrepresentation defense of Central National should have been granted because there was insufficient evidence to support the jury's verdict against QCF on the issue.

 Since misrepresentation is an affirmative defense, the burden of proof is on defendant Central National. *See Haslund v. Seattle*, 86 Wn.2d 607, 620-21, 547 P.2d 1221 (1976); *Olpinski v. Clement*, 73 Wn.2d 944, 950, 442 P.2d 260 (1968). Misrepresentation in obtaining insurance must be proved by clear, cogent, and convincing evidence. *See generally Beckendorf v. Beckendorf*, 76 Wn.2d 457, 462, 457 P.2d 603 (1969). The standard of proof is a high one, requiring "that the trier of fact be convinced that the fact in issue is 'highly probable'." *Colonial Imports, Inc. v. Carlton Northwest, Inc.*, 121 Wn.2d 726, 735, 853 P.2d 913 (1993).

Jury instruction 8 instructed the jury that

> Central National/Highlands have asserted a defense that Queen City Farms and/or its brokers intentionally concealed material facts about the business conducted at Queen City Farms' property in applying for insurance. To prevail on this defense, Central National/Highlands must prove by clear, cogent and convincing evidence the following:
>
> First, that the insurance company requested the material fact be disclosed on the insurance application.
>
> Second, that Queen City Farms concealed the material fact when it applied for insurance.
>
> Third, that Queen City Farms knowingly concealed the material fact with the intent to deceive the Central National/ Highlands.
>
> Fourth, that Central National/Highlands were unaware of the concealed fact when they issued its [*sic*] policies.
>
> Fifth, that the concealed facts were material to the issuance of the insurance. The facts concealed were material to the issuance of the insurance if knowledge of the true facts would have influenced the insurer's decision about the insurance contracts.

Clerk's Papers (Appellant) vol. 4, at 1120.

■ The only objection to this instruction was by the insurers, who objected on the ground that the instruction required the jury to find an intent to deceive. Exceptions to Instructions (May 26, 1988), at 15. Thus, there is no objection to this jury instruction insofar as it requires that Central National prove a request for disclosure of the risk of the waste ponds. We do not address whether a request for disclosure is a proper element of Central National's misrepresentation defense. Instructions given by a trial court to a jury are treated as the properly applicable law if not objected to. *See generally Lutheran Day Care v. Snohomish Cy.*, 119 Wn.2d 91, 113, 829 P.2d 746 (1992) (citing 15 Lewis H. Orland & Karl B. Tegland, Wash. Prac., *Trial Practice — Civil* § 380, at 56 (4th ed. 1986)), *cert. denied*, 122 L. Ed. 2d 353 (1993); *see, e.g., State v. Ng*, 110 Wn.2d 32, 39, 750 P.2d 632 (1988).

■ We agree with QCF that Central National has failed in its burden of proving misrepresentation. Central National did not prove it requested information about the risk, nor did it prove that any misrepresentation was material to its decision about the insurance contracts. Having in mind the clear, cogent, and convincing standard of proof, we review the trial court's denial of the motion for a judgment n.o.v.

> In ruling on a motion for judgment notwithstanding the verdict, a trial court exercises no discretion. The court must accept the truth of the nonmoving party's evidence and draw all favorable inferences that may reasonably be evinced. The evidence must be viewed in the light most favorable to the nonmoving party; the court may grant the motion only where there is no competent evidence or reasonable inference that would sustain a verdict for the nonmoving party. " 'If there is any justifiable evidence upon which reasonable minds might reach conclusions that sustain the verdict, the question is for the jury.' "

(Footnotes omitted.) *Douglas v. Freeman*, 117 Wn.2d 242, 247, 814 P.2d 1160 (1991) (quoting *Lockwood v. AC&S, Inc.*, 109 Wn.2d 235, 243, 744 P.2d 605 (1987) (quoting *Levy v. North Am. Co. for Life & Health Ins.*, 90 Wn.2d 846, 851, 586 P.2d 845 (1978))).

Viewing the evidence most favorably to Central National, and drawing all reasonable inferences in its favor, there is insufficient evidence under the clear, cogent, and convincing standard to sustain a verdict for Central National.

First, as to any request for information about any risk associated with the waste ponds, Central National relies upon the testimony of Ed Lea, the underwriter who authorized the issuance of Central National's 1977 policy. Lea testified that in 1977 the questions on the applications used on behalf of Central National asked what the insured did and what its experience had been, type of losses, "generally everything we could learn about the risk itself". Testimony of Lea (May 25, 1988), at 10. However, he also testified he had no present memory of any of the Central National policies at issue, and did not recall the specific application for Central National insurance. He did not recall if the insurance application asked about pollution-related risks. He testified that he would not have thought about asking about activities on the farm 7 years earlier. The latter testimony is particularly important, since the waste pits had been largely inactive for those 7 years. See Br. of Appellant Queen City Farms, at 6 ("[d]isposal activity . . . effectively ceased in 1969 or 1970") (citing Testimony of Banchero (May 12, 1988), at 98-99).

This evidence and the reasonable inferences therefrom are not sufficient proof under the clear, cogent, and convincing standard that there was any request by Central National for disclosure of the waste ponds and the associated risk. The most favorable view of the evidence is that QCF was asked what its activities were when the application was made, and what its insurance experience and losses had been. Neither of these inquiries would have elicited information about activity involving the waste pits years earlier, nor the existence of the pits. Lea's statement that QCF would have been asked for "generally everything [that Central National] could learn about the risk itself" is too vague and general from which to draw the inference that

QCF was requested to disclose risks associated with the waste ponds. A verdict cannot be founded on mere speculation. *Hojem v. Kelly*, 93 Wn.2d 143, 145, 606 P.2d 275 (1980). Any inference drawn from Mr. Lea's statement about "everything" that Central National "could learn" would be speculative at best, and clearly was not sufficient under the clear, cogent, and convincing standard.

More importantly, aside from failing to prove a request as required by instruction 8, Central National completely failed to prove materiality, *i.e.*, whether disclosure of the waste ponds on the property would have influenced its decision about the insurance contracts. Although Lea testified he would not have underwritten a risk which described a liquid waste disposal site on a piece of property, he also testified that he would not have made the decision, and he did not know "if they would have written it". Testimony of Lea (May 25, 1988), at 13. Whether this witness thought he would have or would not have written the contracts is irrelevant. By his own admission he did not make the decision and did not know what the decision would have been had the risk been disclosed.[4]

Central National also relies upon testimony by Lee Lindeen, an underwriter for a different insurance company, that the risk would have been declined. However, Mr. Lindeen was not a Central National underwriter, and was speculating about what another insurance company might have done. Mr. Lindeen's purely speculative testimony is not sufficient under the clear, cogent, and convincing standard of proof to establish that Central National would have made a different decision about the insurance contracts if it had known of the waste ponds.

Because as a matter of law Central National failed in its burden of proof, the trial court erred in denying QCF's motion

---

[4]Of some interest, Lea stated as a fact from information in the insurer's file that since Unigard (the primary insurer) was willing to accept primary coverage, the excess would probably be a satisfactory risk, because Unigard was a good underwriter. That statement undercuts his own claim that he would not have written the risk, even had the decision been his.

for a judgment notwithstanding the jury's verdict on misrepresentation.

We turn to QCF's challenge to the Lloyd's misrepresentation defense. SDC/QCF's owners hired insurance brokers to obtain comprehensive insurance for SDC and its related companies, including a commercial garbage hauling business and QCF. In an 8-page letter written in 1965 to the prospective insurers, QCF's broker described the various activities and risks associated with the companies. He described QCF by stating that the owners of SDC "also have buildings which they rent and some vacant land plus a 160-acre farm (Queen City Farms) which formerly was a hog ranch but which now is vacant." Clerk's Papers (Respondent) vol. 17, at 3224. In fact, the site was 320 acres with at least two houses, other buildings, and the hazardous waste dump site. After receiving this letter, the Lloyd's broker telexed back asking "WHERE RUBBISH DISPOSED AND SURROUNDING NUISANCE EXPOSURE." Exhibit A-62 (Dec. 21, 1965 cable). QCF's broker responded "ASSURED [INSURED] ONLY DELIVERS GARBAGE RUBBISH AND NO RESPONSIBILITY DUMPSITE THEREFORE NO EXPOSURES THIS ASPECT AND CONSIDER GOOD RISK UMBRELLA STOP." Exhibit A-62 (Dec. 23, 1965 cable). At the time this cable was sent, QCF's owners and its broker knew about the waste pits at Queen City Farms.

Lloyd's maintains that QCF materially misrepresented the risk associated with insuring the farm. To show the materiality of the misrepresentation, Lloyd's presented the testimony of a Lloyd's underwriter, Andrew Drysdale, which was admitted over QCF's objection. Drysdale, who testified as an expert witness, opined that the fact that the QCF site was a large-scale industrial waste dump site would have been important to a London underwriter in 1966, and that if the underwriters had been told the truth, they most likely would have done something other than what they did, agree to insure the QCF site with no conditions and for a de minimis premium. Testimony of Drysdale (May 20, 1988), at 40-42.

QCF argues that the trial court abused its discretion when it overruled QCF's foundational objection to the expert testimony of Drysdale concerning underwriting practices of Lloyd's syndicates regarding waste disposal sites and operations. QCF argues that Drysdale lacked the factual "knowledge, skill, experience, training, or education" required by ER 702, strayed from the area of his expertise, and gave an opinion without sufficient foundational facts upon which to base the opinion.

ER 702 provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"The admissibility of expert testimony under Rule 702 will depend upon whether the witness qualifies as an expert and upon whether an expert opinion would be helpful to the trier of fact." 5A Karl B. Tegland, Wash. Prac., *Evidence* § 288, at 380 (3d ed. 1989); *see In re Young*, 122 Wn.2d 1, 57, 857 P.2d 989 (1993). "Trial courts retain broad discretion in determining whether an expert is qualified and will be reversed only for manifest abuse." *Harris v. Groth*, 99 Wn.2d 438, 450, 663 P.2d 113 (1983).

An expert must stay within the area of his expertise. *See McBroom v. Orner*, 64 Wn.2d 887, 889, 395 P.2d 95, 11 A.L.R.3d 914 (1964); *Sehlin v. Chicago, M., St. P. & Pac. R.R.*, 38 Wn. App. 125, 132-33, 686 P.2d 492 (trial court did not err by refusing to allow railroad worker to testify as expert where no effort was made to lay sufficient foundation to qualify the witness as to proper methods of rerailing railroad cars), *review denied*, 102 Wn.2d 1022 (1984); *cf. Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 50-51, 738 P.2d 665 (1987) (court did not err in excluding testimony of engineer who had almost no experience with reverse engineering of the type needed).

In addition, while ER 703 is intended to broaden the acceptable bases for expert opinion, there is no value in an

opinion that is wholly lacking some factual basis. 5A Tegland § 304, at 451; *see Davidson v. Municipality of Metro. Seattle*, 43 Wn. App. 569, 575, 719 P.2d 569, *review denied*, 106 Wn.2d 1009 (1986). Also, while under ER 705 the expert need not disclose the facts and data underlying his or her opinion unless the judge requires otherwise, the expert "may in any event be required to disclose the underlying facts or data on cross examination." ER 705. "Rule 705 allows the cross-examiner to probe the knowledge of the witness and the facts and elements relating to the witness's opinion." (Footnote omitted.) 5A Tegland § 313, at 489. Where there is no basis for the expert opinion other than theoretical speculation, the expert testimony should be excluded.

Drysdale testified that the Lloyd's insurance market was a society consisting of some 30,000 members grouped into about 150 syndicates. Testimony of Drysdale (May 20, 1988), at 7-8, 31. The syndicates, in turn, were managed by corporations that acted as the underwriting manager for the syndicate. Each syndicate specialized in certain risks.

Drysdale testified that his syndicate did not underwrite any of the QCF insurance, and that he had never underwritten insurance covering a waste disposal site or operation and had no personal knowledge of any of the other 149 syndicates' underwriting practices for such risks. He testified that he couldn't say what other underwriters "were up to" with regard to that type of insurance, and he was not aware of the underwriting practices of other Lloyd's underwriters with respect to dump sites. He admitted he had no knowledge one way or the other that another underwriter was issuing insurance to cover dump sites. Drysdale never talked to the actual underwriters. Testimony of Drysdale (May 20, 1988), at 31-35, 51-53, 62-63.

We agree with QCF that Drysdale's opinion testimony should have been excluded and the trial court abused its discretion by admitting the testimony. Although Drysdale may have been an expert as to certain practices of Lloyd's underwriters, and an expert as to the underwriting prac-

tices of his own syndicate, he was not qualified to testify as to the Lloyd's policies at issue and whether misrepresentations by QCF were material, *i.e.*, whether "knowledge of the true facts would have influenced the insurer's decisions about the insurance contracts." Instruction 7; Clerk's Papers (Appellant) vol. 4, at 1119. His testimony strayed beyond his field of expertise, *i.e.*, he lacked the factual "knowledge, skill, experience, training, or education" required by ER 702, in that he had no knowledge whatever of the underwriting practices of the syndicates which insured QCF, and could not state a generally accepted standard practice for all of the Lloyd's syndicates. His testimony also should have been excluded because it lacked sufficient foundational facts to support his opinion that the actual underwriters would have reached a different decision about issuing the insurance had they known of the waste ponds. His testimony that they would not have done so is conjecture and speculation.

Lastly on this issue, Lloyd's maintains that if the trial court erred in allowing the testimony, any error was harmless. Lloyd's reasons that the deposition testimony of Malcolm Beard, who was an underwriter on one of the Lloyd's policies, was sufficient evidence as to the materiality of the misrepresentations. Beard's deposition is found in the Clerk's Papers. The verbatim transcript indicates that part of the testimony was read to the jury. Verbatim Report of Proceedings (May 25, 1988), at 9-10. However, that testimony was not transcribed, and it is not possible to determine which part of the deposition the jury heard.[5] Thus, it is not possible to determine whether Beard's deposition testimony which the jury heard supports a determination of materiality. For this reason, we do not consider the Beard deposition.

[5] A designation of deposition testimony to be introduced and read to the jury has been provided, but it is unknown whether the trial court permitted the designated portions to be read.

In light of our conclusion that Lloyd's expert witness's testimony should have been excluded, and our conclusion that there remains no proof on this record of materiality of any misrepresentations by QCF, Lloyd's materiality defense must be rejected.[6]

### CONCLUSION

We affirm the Court of Appeals' holding that Lloyd's is liable under its excess policies for damage resulting from escape of toxic materials from the waste pits. The jury has determined that QCF expected or intended that material from the waste ponds would leak into the groundwater under either an objective or subjective standard as of December 31, 1968, and the Lloyd's policy does not contain any pollution exclusion which must be considered. Also, Lloyd's misrepresentation defense fails.

There remain factual questions insofar as the expectation and intention of Maryland Casualty and Central National's policies are concerned, which must be resolved under a subjective standard. This case is therefore remanded for resolution of the remaining factual questions involving the insurance issues in accord with our analysis herein. Central National failed to prove its misrepresentation defense, and is foreclosed from reasserting it on remand.

DOLLIVER, SMITH, and JOHNSON, JJ., concur.

ANDERSEN, C.J. (concurring and dissenting) — I concur with the result and the reasoning of all of the issues in Justice Brachtenbach's majority opinion with the exception of the material misrepresentation issue. With respect to that issue, I agree with Justice Utter's dissenting opinion that evidence was presented from which the jury reasonably

---

[6]We need not, and do not, reach other challenges made by QCF to Lloyd's misrepresentation defense.

could have found a material misrepresentation and that
we should respect the jury's finding of fact on that issue.

[Dissent amended by orders of the Supreme Court March
22 and July 20, 1995.]

UTTER, J. (dissenting) — I disagree with the majority's
conclusion the trial court improperly denied a motion for a
judgment n.o.v. with respect to the Lloyd's of London policy.
Because evidence was presented from which the jury reason-
ably could have inferred a material misrepresentation was
made, we should respect the jury's finding of fact on this is-
sue.

The jury was instructed that the insurers bore the burden
of proving by clear, cogent, and convincing evidence that a
material misrepresentation had been made by the insured
with the intent to deceive the insurers. Instructions 7, 8.
Clerk's Papers (Appellant) vol. 4, at 1119-20. The jury re-
turned a verdict in favor of Lloyd's and Central National.

A judgment n.o.v. may only be granted when, viewing the
evidence and *reasonable inferences* that can be drawn from
it most favorably to the nonmoving party, the court can say
as a matter of law that there is no substantial evidence to
support the verdict. *Nord v. Shoreline Sav. Ass'n*, 116 Wn.2d
477, 486, 805 P.2d 800 (1991) (citing *Cowsert v. Crowley Mar-
itime Corp.*, 101 Wn.2d 402, 405, 680 P.2d 46 (1984)). Substan-
tial evidence is evidence which "would convince an unpre-
judiced, thinking mind of the truth of the declared premise."
*Nord*, 116 Wn.2d at 486 (quoting *Cowsert*, 101 Wn.2d at 405).
The record contains substantial evidence to support the
jury's verdict both with respect to the fact a misrepresenta-
tion was made and that it was material. The jury heard the
evidence described below.

Seattle Disposal Company/Queen City Farms, Inc. owners
hired insurance brokers to obtain comprehensive insur-
ance for Seattle Disposal Company (SDC) and its related
companies, including a commercial garbage hauling busi-

ness and Queen City Farms, Inc. (QCF). The broker who obtained the Lloyd's coverage was Ronald Kokesh. See transcript of Testimony of R.E. Kokesh (May 19, 1988), at 19.

In an 8-page letter written in 1965 to the prospective insurers, Mr. Kokesh described the various activities and risks associated with the companies. He described the QCF operation by explaining that the owners of SDC "also have buildings which they rent and some vacant land plus a 160 acre [farm] (Queen City Farms) which formerly was a hog ranch but which now is vacant." Clerk's Papers (Respondent) vol. 17, at 3224. In fact, the site was 320 acres with at least two houses, other buildings, an airstrip, and an industrial waste dump site, consisting of open pits of liquid industrial waste. See transcript of Testimony of John Banchero (May 12, 1988), at 14-15. Although the dumping ceased in 1969 or 1970, the pits remained on the property filled with liquid industrial wastes.

Upon receipt of Kokesh's letter, the Lloyd's broker telexed back asking "WHERE RUBBISH DISPOSED AND SURROUNDING NUISANCE EXPOSURE." Exhibit A-62 (Dec. 21, 1965 cable). Kokesh esponded "[INSURED] ONLY DELIVERS GARBAGE RUBBISH AND NO RESPONSIBILITY DUMPSITE THEREFORE NO EXPOSURES THIS ASPECT AND CONSIDER GOOD RISK UMBRELLA STOP." Exhibit A-62 (Dec. 23, 1965 cable).

At the time this representation was made, it is uncontested that QCF's owners and Mr. Kokesh knew about the industrial waste pits at Queen City Farms. See transcript of Testimony of Kokesh (May 19, 1988), at 16. It was therefore well within the jury's province to conclude a misrepresentation was made when Kokesh responded that QCF had no responsibility for a dumpsite. The materiality of that misrepresentation was likewise a question of fact for the jury. Because the jury heard evidence from which it reasonably could have inferred a material misrepresentation, we should affirm the trial court's denial of a judgment n.o.v.

The jury heard the testimony of Andrew Drysdale, a Lloyd's underwriter, who indicated the significance to an insurer of Kokesh's failure to mention the waste pits:

Q: Now, I'd also ask — like to ask you another question about the December 11, 1966, letter.

Do you consider that letter to be fairly lengthy, in terms of the type of letters you would receive, in terms of giving information about potential insureds in that time period?

A: Yes.

Q: And it is fairly complete, again, relative to the type of letters you received during that time period with respect to potential insurers?

A: I am afraid that one gets cynical as an underwriter, and it is an axiom of underwriting that the longer the letter, the least it will disclose the one vital element of information required.

Q: Well, that can also be because at the time the element may not seem to be material to anyone's mind?

A: *It would be a most incredible person who thought that a dump site was immaterial to the placement of Seattle Disposal Company's insurances.*

Q: Well, do you believe that it would have been an honest mistake for Mr. Kokesh in writing back to his Telex response to assume, as you have assumed, that you were focusing, or that the Lloyd broker was focusing on Seattle Disposal and not Queen City Farms in asking about the insured's dumping practices?

A: I don't think it is for me to fathom the inscrutable workings of Mr. Kokesh's mind.

. . . .

Q: . . . It is certainly possible that Mr. Kokesh honestly could have felt he was fully answering the question about [the] details where rubbish was dumped, in answering about Seattle Disposal, isn't that correct?

A: *Mr. Kokesh was asked an important question and gave a categoric assurance in the negative.*

He either knew that what he was telling was a lie, or if he didn't know that it was a lie, he had failed to ask his client the question and secure proper instructions.

Q: So you're not willing to give Mr. Kokesh the benefit of your presumption when you read his December 11th letter that you would have asked about Seattle Disposal's garbage operations, and that that particular aspect was being asked about in the Telex?

A: I think in his answer, Mr. Kokesh reveals himself either to be a fool or a knave.

Q: . . . A fool or a knave, but he could [have] been an honest one?

A: He can certainly be an honest fool. It is difficult to imagine an honest knave.

Q: I would also like to ask you another question. The Telex going from the Lloyd's broker to Mr. Kokesh asked for

details where rubbish disposed and surrounding nuisance exposure. Isn't it correct that the surrounding nuisance exposures most concerned about there would have been noise and smell associated with the dump?

A: That is correct. In the letter Mr. Kokesh had described —

Q: Thank you, Mr. Drysdale. You have answered the question. Now, in responding to questions about details where rubbish disposed, isn't it true that a response to the effect that rubbish, garbage is disposed in an isolated area, not near surrounding homes, would have been the type of positive response that the Lloyd's broker was looking for?

A: The Lloyd's broker was looking for confirmation that Mr. Kokesh's letter accurately described his client's activities; namely, that he collected garbage, not that he ran either a dump site or a garbage dump.

(Italics mine.) Transcript of Testimony of Andrew Drysdale (May 20, 1988), at 58-60.

The majority maintains Drysdale's testimony should have been excluded on the grounds it was "wholly lacking [in] some factual basis" and there was "no basis for the expert opinion other than theoretical speculation", because Drysdale did not underwrite the QCF insurance at issue and had no personal knowledge of Lloyd's underwriting practices generally. See majority, at 103.

The majority's characterization of Drysdale's testimony is unwarranted. Drysdale was an underwriter at Lloyd's during the period in question. As such, he was qualified to present his opinion whether the presence of an industrial waste site would have been material to a Lloyd's underwriter in 1966, and whether it was the sort of information which would generally be elicited by Lloyd's inquiry regarding nuisance exposure. See transcript of Testimony of Drysdale (May 20, 1988), at 40-42.

The other reason the majority advances to support its conclusion that Drysdale's testimony was erroneously admitted is likewise unpersuasive. The majority maintains that Drysdale's testimony went beyond the proper scope of expert testimony. Drysdale, however, specifically averred on the question of Kokesh's state of mind. See transcript of Testimony of Drysdale (May 20, 1988), at 40-42. ("It is not for me to fathom the inscrutable workings of Kokesh's mind.")

That determination was for the jury to make, and the jury made it.

In addition to Mr. Drysdale's testimony, the jury heard testimony from other professionals who had been in the insurance industry in the 1960's. Some indicated the presence of an industrial waste site should have been disclosed upon request for a general description of the property, and that this information would have been material to an insurer during the relevant period;[7] others contested this testimony. Because the testimony about materiality was contested at trial, it was for the jury to evaluate the credibility of the parties and their assertions, and enter its findings accordingly.

On the record before us, the majority's conclusion the trial judge improperly denied a motion for judgment n.o.v. with respect to the Lloyd's policy is untenable. Construing the evidence presented and the inferences that reasonably can be drawn from it in Lloyd's favor, as we must, the trial court properly denied the motion.

---

[7]For example, Catherine Davidson, who was employed by Travelers Insurance Company as an underwriter in the 1960's, indicated in her testimony that the presence of such a site would have presented a nuisance exposure, would have affected the decision to insure, transcript of Testimony of Catherine Davidson (May 24, 1988), at 22, and should have been identified on the application for insurance. See transcript of Testimony of Davidson, at 26-27. She also testified that underwriters at Travelers Insurance were becoming aware of pollution risks in the 1960's. Transcript of Testimony of Davidson, at 24.

Mr. Linden, a liability underwriting manager in 1966 at Industrial Indemnity Insurance, testified that the insurance aspects of pollution were becoming appreciated in the mid to late 1960's. Transcript of Testimony of Lee Linden (May 5, 1988) vol. 1, at 38. He also testified that although the insurance application probably would not have inquired about pollution risks per se, see transcript of Testimony of Linden vol. 2, at 12, it would have requested a description of the property, specifically "the types of property that were owned: For example, a store or a dump site or vacant land, whatever the insured is presenting to use for insurance purposes." Transcript of Testimony of Linden vol. 1, at 10-11. He also testified that had the insurance company known about the liquid industrial waste ponds it probably would not have insured the site. Transcript of Testimony of Linden vol. 2, at 10. See also transcript of Testimony of Linden vol. 1, at 44, indicating such knowledge would have affected the decision to insure.

Queen City maintains that Lloyd's was required to tender back all premiums to preserve the defense of misrepresentation. The argument is unpersuasive.

The record contains a letter prior to trial on behalf of two of the named insurers offering to tender back the premiums and indicating that "it is our understanding that the premiums were tendered in a single sum on behalf of *all the named insureds* under the policies, making it difficult to now go back and compute QCF's proportionate share of the premium." (Italics mine.) Letter, app. A Br. II of Resp'ts (Misrepresentation and Evidence Issues). The letter further states that the proportionate share of the premiums owed should be postponed pending a ruling on the misrepresentation issue, after which the proportionate share of the sums owed could be computed with the court's supervision.

The letter does not refer to Lloyd's and could be construed to only refer to Industrial Indemnity and U.S. Fire. If given its broadest interpretation to include Lloyd's, there still remains the question of whether one insured can speak for another, a question that need not be reached. Only if the defrauded party elects the remedy of *rescission* must the party tender the payments received under the contract. *See Glandon v. Searle*, 68 Wn.2d 199, 204, 412 P.2d 116 (1966) and *Neat v. United States Fid. & Guar. Co.*, 170 Wash. 625, 17 P.2d 32 (1932) (tender of payments required of a party who seeks to rescind a policy).

Under contract law, a material misrepresentation permits the defrauded party to elect from three possible remedies: damages, rescission, or enforcement of the bargain against the fraudulent party according to the fraudulent party's representation of the bargain. *See* 12 Samuel Williston, *Contracts* § 1523, at 606-07 (3d ed. 1970). In this case, Lloyd's could have sought to rescind the policy, affirm the policy and sue for misrepresentation, or, as it did, affirm the policy and assert misrepresentation as a defense.

If, as here, the defrauded party elects not to rescind the contract, tender of payments is not required:

> There is a wide distinction between an action brought to rescind a contract on the ground of fraud, and an action to recover damages for fraud arising out of a contract. The action to rescind is of an equitable nature, and the party seeking equity must do equity. On discovering the fraud, the party injured must tender back to the other party the benefits of the contract, so far as received by him, and place the other party as nearly as possible [in status quo]. He must act promptly, keep his tender available, and bring his action without unreasonable delay. *The action for damages is a law action for a money judgment,* **requires no tender**, and may be brought by the injured party at any time within the statute of limitations. Nor does an affirmance of the contract after discovery of the fraud extinguish the right to an action for damages on account of the fraud. An affirmance bars only the right to rescind.

(Italics and boldface mine.) *Pronger v. Old Nat'l Bank*, 20 Wash. 618, 625-26, 56 P. 391 (1899).

QCF's reliance on *Glandon v. Searle, supra* at 204, and *Neat v. United States Fid. & Guar. Co., supra,* is misplaced. In both cases, the insurers sought to *rescind* the contract on the ground the insured's misrepresentations rendered the policies void ab initio. *Glandon*, 68 Wn.2d at 203; *Neat*, 170 Wash. at 632. Because Lloyd's does not seek to rescind the contract, but rather to affirm the contract under the terms as represented by Queen City Farms, the absence of tender does not operate to waive its right to assert the defense of misrepresentation.

Also unpersuasive is Queen City's contention that RCW 48.18.080 required the trial court to exclude from evidence the correspondence preceding Lloyd's issuance of the insurance policy. The statute requires the insured's application for insurance to be attached to the policy when issued:

> No application for the issuance of any insurance policy or contract shall be admissible in evidence in any action relative to such policy or contract, unless a true copy of the application was attached to or otherwise made a part of the policy when issued and delivered.

RCW 48.18.080.

The critical inquiry with respect to this issue is whether the correspondence between the parties constituted an application for the purposes of construing the attachment statute.

We conclude that it did not. To hold otherwise would be to transform all paper trails of negotiations into applications, even where neither party so intended. Moreover, the Legislature does not appear to have intended the (protective) attachment requirement to apply in situations where sophisticated commercial entities are negotiating with one another at arm's length. Had the Legislature wished it to apply, it could have required an application in that context. *See* RCW 48.18.060 (in which the Legislature has expressly required insurance companies to have applications for any "life or disability insurance contract upon an *individual*", with some exceptions). (Italics mine.)

The statute recognizes the differences between statements made during negotiations and those appearing on that application for insurance. With respect to the former it provides:

> [N]o oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material [to] defeat or avoid the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.

RCW 48.18.090.

Queen City maintains that *Lundmark v. Mutual of Omaha Ins. Co.*, 80 Wn.2d 804, 498 P.2d 867 (1972) requires this court to find that correspondence between the parties constitutes an application. There, an insured completed a written application for insurance. Shortly thereafter, the insured discovered he had an ailment which he had not disclosed, and communicated it to the insurance company. A memorandum reflecting the new information was subsequently prepared by the insurer, which then rewrote the policy. When the insured later filed a claim, the trial court excluded both the application and the memorandum under RCW 48.18.080, on the ground the insured was entitled to have the whole application before him, if it could be used against him as a defense. *Lundmark*, 80 Wn.2d at 807.

*Lundmark* is distinguishable from the case at bar because in that case a written application had been made in the first

instance. Where an application has been initially made, it is sensible to require substantial modifications to it to be attached to the original policy. *Lundmark* does not establish that where, as here, there is no initial application, all correspondence should be treated as an application.

In sum, I conclude the attachment statute does not apply on these facts. The statute by its terms does not require a formal application under the circumstances at issue here; and the correspondence between Queen City's broker and Lloyd's is, in any event, properly characterized as negotiations. Accordingly, it should not be treated as an "application" under RCW 48.18.080.

Our holding on this issue does not prevent an insurance company from making insurance coverage contingent upon the completion of a formal application if it so chooses; nor does it preclude the Legislature from amending the statute to encompass the circumstances presented here if it sees fit.

DURHAM, C.J., GUY and MADSEN, JJ., and ANDERSEN, J. Pro Tem., concur with Justice Utter's resolution of the issue whether Lloyd's should be precluded from raising a misrepresentation defense due to failure to tender back premiums before trial, and the issue whether correspondence preceding Lloyd's issuance of its policies should have been excluded from evidence under RCW 48.18.080.

GUY, J. (dissenting) — The majority concludes hazardous wastes at Queen City Farms leaked into the groundwater suddenly over the course of 30 years. Because the majority ignores the plain meaning of Queen City's insurance policies, I respectfully dissent.

These, I believe, will be some of the consequences of the majority's opinion: First, the majority's opinion forecloses future sales of qualified pollution coverage. By finding ambiguity where none exists, the majority's opinion obliterates any distinction among risks of pollution. The majority concludes the phrase "sudden and accidental" is ambiguous and construes it to mean "unexpected and unintended". In addition, the majority requires the trier of fact to determine what Queen City *subjectively* expected or intended. Regardless of what the jury may decide on remand, the majority tells insurers: if you insure any risk of contamination, you insure all. Those individuals or businesses that wish to

insure against a truly sudden and accidental discharge of pollution and pay a premium limited to that risk will find no such coverage available. They will either purchase expensive environmental impairment liability insurance, placing them in the risk pool with Queen City's counterparts, or attempt to self-insure against all risk.

This elimination of choices results from the court ignoring clear and unambiguous terms in the qualified pollution exclusion. The majority reads the exclusion to conclude the migration of waste triggers the clause. That clause excludes coverage for discharging pollutants onto the land as well as for failing to contain toxins once in the sludge pit. The exception to the exclusion states: "this exclusion does not apply if such discharge, dispersal, release *or* escape is sudden and accidental". (Italics mine.) Clerk's Papers (Respondent) vol. 1, at 140, vol. 2, at 267. Until the majority's opinion, the word "or" was disjunctive, requiring the court to interpret each of the four nouns separately. Dumping toxic wastes into the sludge pit is clearly a "discharge . . . of . . . toxic chemicals into or upon land". Clerk's Papers (Respondent) vol. 1, at 140. To reach the contrary conclusion, the majority must change "or" to "and" and rely on a legal fiction, the average purchaser. This is a manufactured ambiguity.

The opinion also misinterprets "sudden and accidental". The majority attempts to distinguish this court's opinion in *Roller v. Stonewall Ins. Co.*, 115 Wn.2d 679, 801 P.2d 207 (1990), where we concluded:

[P]ursuant to the common sense definition, "accident" is not a subjective term. Thus, the perspective of the insured as opposed to the tortfeasor is not a relevant inquiry. Either an incident is an accident or it is not.

*Roller*, 115 Wn.2d at 685. The majority sidesteps this ruling by redefining "accidental" as "unintended" and then by judging intent with a subjective standard. Nothing in *Roller* permits such a step.

Furthermore, the definition of the word "sudden", to make any sense, must have a temporal element. Contamination of groundwater cannot happen suddenly over 30 years; I con-

sider that a *gradual* event. The majority notes correctly the court in *Anderson & Middleton Lumber Co. v. Lumbermen's Mut. Cas. Co.*, 53 Wn.2d 404, 333 P.2d 938 (1959) refused to define sudden as "instantaneous". However, a single case decided in 1959 does not substitute for analysis. The court in *Anderson* had evidence of a sudden occurrence — a wobbling bandsaw wheel — sufficient to find coverage. The *Anderson* court's definition of sudden as "unforeseen and unexpected" more appropriately defines the term "accidental".

I believe the phrase "sudden and accidental" is unambiguous, meaning quickly and without warning, design, or intent.

The second consequence results from the majority's use of a judicially created factor called "the average purchaser of insurance". This legal fiction enables the majority to disregard the facts of a given agreement as it reaches for the most abstract, formalistic resolution available. The term "average purchaser" appears twice in the majority's opinion. First, the majority adopts the subjective standard based on this premise: "the average purchaser of insurance would understand that the policy language provides for coverage for damage resulting from most acts of ordinary negligence." Majority, at 66. Who is this average purchaser? The majority suggests, by analogy, it is the driver of a car who negligently backs up into traffic. Majority, at 66.

The court's use of the fictional average purchaser obscures the substantial diversity in the sophistication of buyers and sellers, the types of insurance, the negotiations preceding a purchase, and the language of a given policy. Here, educated business people, well versed in insurance contracts, purchased comprehensive general liability policies, not homeowners or automobile insurance. The court's reduction of complex business transactions into simplistic maxims only benefits the court's resolution of these cases. We do no favors to the buyers of commercial policies when we equate their knowledge of insurance to an automobile driver's understanding of a collision deductible.

The average purchaser appears a second time at another critical point in the majority's opinion. To justify defining

the polluting event as escape from, rather than discharge into, the sludge pit, the majority announces this unsupported assumption:

> It seems to us that an average purchaser of insurance in earlier years would have been justified in thinking that there was coverage for the placement of wastes into a waste pit, or a landfill, which was expected to contain the wastes and from which it was not expected that they would discharge, disperse, release, or escape into the groundwater . . ..

Majority, at 79.[8] Ronald Kokesh, Queen City's insurance broker, made no such assumption. On December 23, 1965, Kokesh intentionally misrepresented to the insurers Queen City's information about the waste pits in order to obtain insurance. A substantial gap exists between the majority's speculation about an average purchaser's thoughts and what actually happened in this case.

Third, the court would reward the irresponsible polluter. By adopting a subjective standard to judge both whether damage from an occurrence was unexpected and unintended *and* whether discharge of pollution was sudden and accidental, owners of sludge pits, toxic waste dumps, landfills, and other Superfund sites need only plead ignorance and thereby escape responsibility. The majority accepts the plea of the polluters, noting "in the late 1960's little was known about environmental danger posed by sanitary landfills; few recognized the extent to which landfills threatened pollution of groundwater." Majority, at 79. Contrast this assertion about the lack of understanding of threat of pollution, even in the 1960's, with the facts in this case. For over a decade Boeing trucked hundreds of thousands of 55-gallon drums full of heavy metals and other hazardous wastes to Queen City and dumped them into the sludge pits. In one 3-year period, Boeing discharged nearly 3 million gallons of toxins into the pits. These pits had a *total* capacity of only 1 million gallons.

---

[8]An equally plausible assumption, endorsed at times by the majority, is that the toxic wastes would discharge, disperse, release or escape from containment, but because of natural filtration would not cause damage when they reached the groundwater. Phrased this way, the average purchaser only failed to foresee damage from hazardous wastes, not their migration from containment.

Where did 2 million gallons of hazardous wastes go? The Environmental Protection Agency concluded:

> Chemical analyses of the sludge and some of the soil samples [from the ponds] confirm the presence of significant concentrations of heavy metals, chlorinated hydrocarbons, phenolic compounds, polycyclic aromatic hydrocarbons, polychlorinated biphenyls, ketones, and aromatic hydrocarbons.

See EPA Order on Consent, Clerk's Papers (Petitioners) vol. 2, at 471. The EPA identified dangerous levels of at least 43 toxic chemicals in Queen City's ponds, including arsenic, nickel, PCB's, benzene, and chloroform, all known carcinogens. Other than digging the three ponds, Queen City's sole preparation of the site to contain these toxins was to burn the liquid wastes and rely on the tarlike sludge to line the pits.

Even though a *reasonable* landowner in the same circumstances may know with absolute certainty that toxins will contaminate surrounding groundwater, the trier of fact *must*, under the majority's opinion, disregard this proof in favor of credible evidence of the polluter's self-asserted, subjective ignorance.

In *Rodriguez v. Williams*, 107 Wn.2d 381, 729 P.2d 627 (1986), we could not accept such an absurd result. The court in *Rodriguez* adopted a subjective test to decide whether, under defendant Williams' homeowner policy, Williams intended to harm his 15-year-old stepdaughter when he committed incest. The court assumed Williams had no such subjective intent, but then ruled his actual subjective intent was irrelevant. As a matter of law, the court construed intent to harm based on Williams' acts. When faced with the obvious consequences of a subjective test, the court created a special exception for incest.

The majority tries to soften *Rodriguez.* After nearly nine pages of complex, well-written analysis in support of a subjective standard, the majority notes "[o]ne commentator has suggested that the difference between an objective standard and a subjective standard may not be a substantial one". Majority, at 69. Would this court reverse a jury's verdict

because of an insubstantial difference? If the majority opinion means what it says, polluters' credible evidence of ignorance — they never expected, intended, or foresaw the escape of contaminates — must triumph at trial, even in the face of overwhelming contrary objective evidence of leaching. Proof of the *reasonableness* of polluters' subjective belief is, by definition, irrelevant.

Queen City should be responsible for pollution damage it knew, or should have known, resulted from its operations. The definition of "occurrence" merges two elements: knowledge (damage is unexpected) and intent (damage is unintended). Clerk's Papers (Respondent) vol. 2, at 448, 466, 495, 519 ("accident . . . which unexpectedly and unintentionally results in . . . property damage"). Because of the critical need to require businesses to internalize the cost of pollution, the court should adopt an objective standard of expectation (knew or should have known) or, at a minimum, create an exception to the subjective standard for polluting events which the insured could reasonably foresee. *See* Jacquelyn A. Beatty, *Exclusions Exclude: Let the Pollution Mean What It Says*, 28 Gonz. L. Rev. 401, 421 (1992-1993) ("polluters are best positioned to be aware of and to mitigate the extent of gradual contaminant release").

I agree with Justice Utter that the majority has inappropriately taken the issues of misrepresentation away from the jury. The majority with this opinion may well interpret the qualified pollution exclusion to extinction. The net result, however, will be to end any hope of affordable insurance coverage for pollution that actually is sudden and accidental.

I would affirm the jury's determination that Queen City expected or intended material from the waste ponds would leak into the groundwater and that insurance coverage was excluded.

DURHAM and MADSEN, JJ., concur with GUY, J.

[Dissent amended by order of the Supreme Court September 29, 1994.]

MADSEN, J. (dissenting) — Washington courts have pursued a tortured analysis of the qualified pollution exclusion; they have labeled this exclusion ambiguous and have eliminated it from insurance policies altogether. Jacquelyn A. Beatty, *Exclusions Exclude: Let the Pollution Mean What It Says*, 28 Gonz. L. Rev. 401, 409 (1992-1993). Unfortunately, the result of the majority's decision today perpetuates and even extends this tortured interpretation of the pollution exclusion in the face of substantial, persuasive authority to the contrary.

While I disagree with nearly every holding by the majority, I will address only those points which cause me most concern.

1. *Contrary to the majority's holding, the pollution exclusion is not ambiguous.*

The majority is correct that the qualified pollution exclusion has generated much discussion and several divergent approaches to interpreting the exclusion language. As one commentator has observed:

> Paradoxically, the courts have almost uniformly ignored the insurers' intent and distorted the phrase "sudden and accidental" beyond recognition. With few exceptions, the courts have extended the coverage of policies containing the pollution exclusion " 'to mean just what they choose it to mean.' "

E. Joshua Rosenkranz, Note, *The Pollution Exclusion Clause Through the Looking Glass*, 74 Geo. L.J. 1237, 1240 (1986) (quoting Lewis Carroll, *Through The Looking Glass* 94 (1946) (Speech of Humpty Dumpty)).

However, many of the recent and better reasoned decisions which have addressed the qualified pollution exclusion have now concluded that the exclusion language is unambiguous. Rosenkranz, at 1264-68; *Technicon Elecs. Corp. v. American Home Assur. Co.*, 141 A.D.2d 124, 131, 533 N.Y.S.2d 91 (1988) (recent cases demonstrate "an emerging nationwide judicial consensus that the 'pollution exclusion' clause is unambigu-

ous and that . . . the intentional discharge of pollutants over an extended period of time" is excluded); *Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc.*, 407 Mass. 675, 680, 555 N.E.2d 568 (1990) (concluding the "better reasoned, and particularly the more recent, judicial interpretations of the pollution exclusion clause" conclude it is clear and unambiguous).[9]

---

[9]A total of 17 state courts have considered whether the term "sudden" is ambiguous. The Supreme Courts of Massachusetts, Michigan, Minnesota, Florida, Ohio, North Carolina and New York, as well as appellate courts in California, Oregon, South Carolina, and Utah have concluded that "sudden" has a temporal meaning and that the pollution exclusion is not ambiguous. Furthermore, federal courts applying the law of various states have concluded that under the law of Kansas, New Hampshire, Maine, Kentucky, Pennsylvania, Tennessee, Oklahoma and Texas the term "sudden" has temporal meaning and the pollution exclusion clause is unambiguous. *ACL Technologies, Inc. v. Northbrook Property & Cas. Ins. Co.*, 17 Cal. App. 4th 1773, 22 Cal. Rptr. 2d 206 (1993); *Dimmitt Chevrolet. Inc. v. Southeastern Fid. Ins. Corp.*, 636 So. 2d 700 (Fla. 1993); *Liberty Mut. Ins. Co. v. SCA Servs., Inc.*, 412 Mass. 330, 588 N.E.2d 1346 (1992); *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392 (1991); *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 480 N.W.2d 368 (Minn. Ct. App.), *review denied* (Mar. 26, 1992); *Petr-All Petroleum Corp. v. Fireman's Ins. Co.*, 188 A.D.2d 139, 593 N.Y.S.2d 693 (1993); *Waste Mgt. of Carolinas, Inc. v Peerless Ins. Co.*, 315 N.C. 688, 340 S.E.2d 374 (1986); *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St. 3d 657, 597 N.E.2d 1096 (1992); *Mays v. Transamerica Ins. Co.*, 103 Or. App. 578, 799 P.2d 653, *review denied*, 311 Or. 150 (1990); *Greenville Cy. v. Insurance Reserve Fund*, 311 S.C. 169, 427 S.E.2d 913 (Ct. App. 1993); *Gridley Assocs., Ltd. v. Transamerica Ins. Co.*, 828 P.2d 524 (Utah Ct. App. 1992); *In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage Litig.*, 15 F.3d 1249 (3d Cir. 1994); *American Motorists Ins. Co. v. General Host Corp.*, 946 F.2d 1482 (10th Cir.), *vacated on other grounds on rehearing*, 946 F.2d 1489 (1991); *A. Johnson & Co. v. Aetna Cas. & Sur. Co.*, 933 F.2d 66 (1st Cir. 1991); *Great Lks. Container Corp. v. National Union Fire Ins. Co.*, 727 F.2d 30 (1st Cir. 1984); *Gould, Inc. v. CNA*, 809 F. Supp. 328 (M.D. Pa. 1992); *Oklahoma Pub'g Co. v. Kansas City Fire & Marine Ins. Co.*, 805 F. Supp. 905 (W.D. Okla. 1992); *United States Fid. & Guar. Co. v. Morrison Grain Co.*, 734 F. Supp. 437 (D. Kan. 1990); *United States Fid. & Guar. Co. v. Murray Ohio Mfg. Co.*, 693 F. Supp. 617 (M.D. Tenn. 1988). In contrast only the Supreme Courts of Colorado, Georgia, Illinois, West Virginia and Wisconsin have found the term "sudden" is ambiguous while only federal courts applying the law of New Jersey, South Dakota, Connecticut, Delaware and Arizona have concluded that "sudden" is ambiguous. *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083 (Colo. 1991); *Claussen v. Aetna Cas. & Sur. Co.*, 259 Ga. 333, 380 S.E.2d 686 (1989); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992); *Joy Technologies, Inc. v. Liberty Mut. Ins. Co.*, 187 W. Va. 742, 421 S.E.2d 493 (1992); *Just v. Land Reclamation, Ltd.*, 155 Wis. 2d 737, 157 Wis. 2d 507, 456 N.W.2d 570 (1990); *Smith v. Hughes*

In retrospect, the prediction of consensus regarding the pollution exclusion may have been optimistic. However, it is clearly correct to say that the "better reasoned" decisions have found the exclusion unambiguous as the following discussion will amply demonstrate.

Most of the debate regarding the exclusion clause revolves around the use of the terms "sudden" and "accidental" and whether the term "sudden" is ambiguous. The most persuasive analysis on this issue concludes that the term is not ambiguous as demonstrated by the language quoted below:

> We cannot reasonably call "sudden" a process that occurs slowly and incrementally over a relatively long time, no matter how unexpected or unintended the process. A "discharge, dispersal, release or escape" of pollutants that happens gradually and continuously for years is not "sudden" in the ordinary and popular sense of the word. Thus, "sudden" necessarily contains a temporal element in addition to its connotation of the unexpected.

(Citations omitted.) *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 754, 15 Cal. Rptr. 2d 815 (1993).

The *Shell Oil* court, along with a large number of recent court opinions considering the term "sudden", concluded that the term must be attributed a temporal meaning. This conclusion is based on the rationale that to give any meaning to the term "sudden", it must be assigned a meaning separate from the term "accidental", particularly where, as in the pollution exclusion here, the two terms appear in the conjunctive. As the *Shell Oil* court explained:

> This approach also avoids making "sudden" and "accidental" redundant. Dictionaries define as "accidental" unexpected and unintended events. . . .

---

*Aircraft Co. Corp.*, 783 F. Supp. 1222 (D. Ariz. 1991); *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 810 F. Supp. 1406 (D. Del. 1992); *Benedictine Sisters of St. Mary's Hosp. v. St. Paul Fire & Marine Ins. Co.*, 815 F.2d 1209 (8th Cir. 1987); *Harleysville Mut. Ins. Co. v. Sussex Cy.*, 831 F. Supp. 1111 (D. Del. 1993); *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 817 F. Supp. 1136 (D.N.J. 1993). Moreover, while the cases noted above applying Connecticut, Delaware, and Arizona law have found the term "sudden" to be ambiguous they have denied coverage for pollution damage under the exclusion clause because the discharge was not accidental.

. . . Therefore, in the phrase, "sudden and accidental," "accidental" conveys the sense of an unexpected and unintended event, while "sudden" conveys the sense of an unexpected event that is abrupt or immediate in nature. "Sudden and accidental" is not ambiguous if we give the words their full significance. A court should not make a phrase ambiguous by unreasonably truncating a word's meaning.

(Footnote and citations omitted.) *Shell Oil*, at 755. *See also Lumbermens*, at 680 ("[f]or the word 'sudden' to have any significant purpose, and not to be surplusage when used . . . in conjunction with the word 'accidental,' it must have a temporal aspect to its meaning"); *Lower Paxon Township v. United States Fid. & Guar. Co.*, 383 Pa. Super. 558, 577, 557 A.2d 393 (1989) (to define "sudden" as "a mere restatement of accidental, would render the suddenness requirement mere surplusage"); *Dimmitt Chevrolet, Inc. v. Southeastern Fid. Ins. Corp.*, 636 So. 2d 700, 703 (Fla. 1993) ("sudden" has temporal meaning); *ACL Technologies, Inc. v. Northbrook Property & Cas. Ins. Co.*, 17 Cal. App. 4th 1773, 1787, 22 Cal. Rptr. 2d 206 (1993) (for "sudden" to have an independent meaning from "accidental" it must be given its temporal meaning); *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 480 N.W.2d 368, 376 (Minn. Ct. App.) ("sudden" carries a temporal connotation of "abruptness"; since accidental means "unexpected", "sudden" must mean relatively quick, not over a long period), *review denied* (Mar. 26, 1992); *Liberty Mut. Ins. Co. v. SCA Servs., Inc.*, 412 Mass. 330, 335, 588 N.E.2d 1346 (1992) ("sudden and accidental" in exclusion clause means "abrupt"); *Hartford Accident & Indem. Co. v. U.S. Fid. & Guar. Co.*, 962 F.2d 1484, 1489-90 (10th Cir.) (pollution exclusion is unambiguous and excludes all contamination damage except damage from discharges that are both accidental and occur over a "short period of time"), *cert. denied*, 121 L. Ed. 2d 335 (1992); *New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1428 (2d Cir. 1991) (for release to be sudden it must occur over a short period of time); *A. Johnson & Co. v. Aetna Cas. & Sur. Co.*, 933 F.2d 66, 75-76 (1st Cir. 1991) (hazardous wastes disposed of at waste disposal site (lagoon) contaminated groundwater; pollution and

contamination which took place as concomitant of regular business activity over extended period of time not sudden and accidental release); *Ogden Corp. v. Travelers Indem. Co.*, 924 F.2d 39, 42 (2d Cir. 1991) (contamination resulting from continuous discharges is excluded because it is not "sudden"); *Hicks v. American Resources Ins. Co.*, 544 So. 2d 952, 954 (Ala. 1989) (the pollution exclusion is unambiguous and bars coverage when applied to a claim involving pollution caused by the purposeful discharge of toxic chemicals); *Transamerica Ins. Co. v. Sunnes*, 77 Or. App. 136, 140-41, 711 P.2d 212 (1985) (the qualified pollution exclusion clearly and unambiguously precludes coverage for intentional and nonsudden discharges of pollutants).

The analysis in the above cited cases is best illustrated by the following passage:

> The pollution exclusion denies coverage unless the discharge is both sudden *and* accidental. The district court held that the phrase includes unexpected events occurring over an extended period of time. Since "accidental" includes the unexpected, however, the district court's construction gave no effect to the word "sudden." The term "sudden," we believe, "when considered in its plain and easily understood sense, . . . is defined with a 'temporal element that joins together conceptually the immediate and the unexpected.'" *The Upjohn Company v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392, 397-98 (1991). Indeed, assigning meaning to both "sudden" and "accidental" eliminates any perceived ambiguity. The district court found "sudden" to be ambiguous because it could mean abrupt or unexpected. Because "accidental" includes the unexpected, however, "sudden" must mean abrupt. To hold otherwise would render the word "sudden" superfluous.

*Aetna Cas. & Sur. Co. v. General Dynamics Corp.*, 968 F.2d 707, 710 (8th Cir. 1992).

The majority observes that cases are divided on whether the term "sudden" is ambiguous. This division is meaningless, however, when the basis underlying the conclusion of ambiguity is flawed. In contrast to the clear reasoning of the cases referred to above, other courts have engaged in various forms of tortured analysis to find ambiguity in the language of the exclusion. The decisions which have reached this con-

clusion generally follow three lines of reasoning, all equally unpersuasive. *Lumbermens*, at 679. The first approach is to analyze the occurrence clause as being in conflict with the exclusion clause. For example, the court in *United Pac. Ins. Co. v. Van's Westlake Union, Inc.*, 34 Wn. App. 708, 712, 664 P.2d 1262, 39 A.L.R.4th 1040, *review denied*, 100 Wn.2d 1018 (1983) compared the language of the occurrence clause with that of the exclusion clause and found a conflict. Since the two could not be reconciled, the court concluded that the pollution exclusion must be ambiguous. Citing *Van's Westlake* the Colorado Supreme Court concluded likewise stating:

> In the portion of the policies defining occurrence, accident is defined to include "continuous or repeated exposure to conditions, which result in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." If "sudden" were to be given a temporal connotation of abrupt or immediate, then the phrase "sudden and accidental discharge" would mean: an abrupt or immediate, and continuous or repeated discharge. The phrase "sudden and accidental" thus becomes inherently contradictory and meaningless. *City of Northglenn v. Chevron, U.S.A., Inc.*, 634 F.Supp. 217, 222 (D.Colo.1986); *United States v. Conservation Chem. Co.*, 653 F.Supp. 152, 203-04 (W.D.Mo.1986); *Van's Westlake Union, Inc.*, 34 Wash. App. at 711-15, 664 P.2d at 1265-66.

*Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1092 (Colo. 1991); *see also Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 2d 90, 122-23, 607 N.E.2d 1204 (1992) (court must give each term in the policy meaning unless to do so would render the clause or policy inconsistent or inherently contradictory; construing "sudden" to mean "abrupt" creates a contradiction with the language of the occurrence clause) (citing *Hecla Mining Co.*).

Cases which follow this approach, such as *Van's Westlake*, fail to appreciate the distinction between the occurrence clause and the exclusion clause. *See* Beatty, at 416. Furthermore, most courts now reject this analysis. Majority, at 88. Recent cases recognize that the focus of the occurrence clause is on the property damage and whether such damage was expected or intended. In contrast, the focus of the exclusion clause is on the release itself and it does not

concern the damage caused by the release. *Lumbermens*, at 679.

The second approach toward finding ambiguity in the language of the exclusion is equally unsound. These decisions are based on public policy considerations. These courts acknowledge that "sudden" has a temporal meaning but decline to apply this meaning. Instead, these courts find ambiguity by looking at the drafting history underlying the exclusion.

> The critical issue is whether the courts of this state should give effect to the literal meaning of an exclusionary clause that materially and dramatically reduces the coverage previously available for property damage caused by pollution, under circumstances in which the approval of the exclusionary clause by state regulatory authorities was induced by the insurance industry's representation that the clause merely "clarified" the scope of the prior coverage.

*Morton Int'l, Inc. v. General Accident Ins. Co.*, 134 N.J. 1, 72, 629 A.2d 831 (1993), *cert. denied*, 114 S. Ct. 2764 (1994). *See also New Castle Cy. v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1198 (3d Cir. 1991) ("[w]hen first confronted with this issue, the reader's initial reaction is likely to be that 'sudden' means 'abrupt' "; yet considering drafting history finds term ambiguous).

Finally, other courts, along with the majority in this case, have followed the third line of analysis which is to find the term "sudden" is ambiguous. This is so, the cases say, because under one reasonable definition of the word it means nothing more than "unexpected". *See, e.g., Claussen v. Aetna Cas. & Sur. Co.*, 259 Ga. 333, 335, 380 S.E.2d 686 (1989); *Just v. Land Reclamation, Ltd.*, 155 Wis. 2d 737, 746, 157 Wis. 2d 507, 456 N.W.2d 570 (1990). In reaching this conclusion, courts have construed "sudden" in isolation without recognizing the significance of the companion word "accidental". *Lumbermens*, at 679. A number of these courts have found an ambiguity by simply finding more than one dictionary definition for the word "sudden". These courts have failed to evaluate the term in the context of the remaining exclusion language. *See, e.g.,*

*Just v. Land Reclamation, Ltd.*, at 745-46; *Outboard Marine*, at 120-21; *Claussen*, at 338.[10] When analyzed in context, unless the term "sudden" is accorded a temporal meaning, the "sudden and accidental" exclusionary exception becomes "unexpected and unintended" and the term "accidental" itself means "unexpected and unintended". Thus, the word "sudden" is rendered superfluous under this approach.

Although the majority in this case at least acknowledges the importance of reviewing the terms of a policy in context, it never answers the above concern.[11] Instead, the majority argues that even though the term "sudden" may sometimes be unambiguous, in the context of the pollution exclusion the term is ambiguous (citing *Anderson & Middleton Lumber Co. v. Lumbermen's Mut. Cas. Co.*, 53 Wn.2d 404, 333 P.2d 938, 34 A.L.R. 731 (1959)). Majority, at 82. In that case "sudden" was held by this court to be ambiguous.

There are a number of problems with relying on *Anderson* for the proposition that "sudden" is ambiguous in the context of the pollution exclusion. First, it is obvious that *Anderson* did not involve a pollution exclusion. Rather, the appeal in that case involved the interpretation of a boiler and machinery policy. Second, the court there was struggling with the meaning of "accidental" to determine coverage in the context of "accident" based coverage. In fact, the court stated,

---

[10]Having found that the term "sudden" is ambiguous, these courts then find that "sudden" means "unexpected" by either construing the ambiguity against the insurer or turning to the drafting history.

[11]It is also interesting to note that the majority gets around this superfluity problem in a novel way later in its opinion when it is faced with the language in another pollution exclusion which excludes coverage for damage to property and cleanup costs "caused by seepage, pollution or contamination" but not where "such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening". The majority recognizes that refusing to give the term "sudden" temporal meaning renders that term superfluous when used in conjunction with "unexpected". However, it whisks the concern away by finding that "sudden" is inconsistent with "seepage", which the majority says, without any cite to authority, does not occur over a short period of time. Majority, at 95.

> There is no suggestion that the policy was not meant to cover breakage resulting from latent defects in the machinery or from fatigue. The cause is not, nor is the result, one which it is claimed is excluded. It is only contended that the result, in order to be within the coverage of the policy, must have happened instantaneously.

*Anderson*, at 408.

In the policy at issue there the term "sudden" was used to define, in part, the meaning of the term "accidental". The term "accidental" was defined as "the sudden and accidental breaking of the bandsaw wheel, or any part thereof, into two or more separate parts while it was in use or connected for use". *Anderson*, at 405. In that context the court's holding that "sudden" did not mean instantaneous makes sense since, as the court pointed out, "the risk to the insurer would be the same, whether a break was instantaneous or began with a crack which developed over a period of time until the final cleavage occurred . . .". *Anderson*, at 408.

In contrast, "sudden" is used here in a pollution exclusion. Moreover, "sudden" is not used to define "accidental". Instead the exclusion employs both the words "sudden" and "accidental" in the conjunctive. The *Anderson* court did not answer the question of whether "sudden" appearing in the conjunctive with "accidental" would have a temporal meaning. The usefulness of *Anderson* as an analogy is further limited by the fact that the risk to the insurers in the case of pollution damage is much greater than that caused by the break at issue in *Anderson*, particularly in this case where the contaminants were released over a 30-year period. *Morton*, at 72 (acknowledging that the literal language of the pollution exclusion clause will result in "a severe restriction of coverage for pollution-caused property damage").

The majority next attempts to strengthen its shaky conclusion that "sudden" is ambiguous by stating that insurance policies often use words which have similar meanings. Majority, at 82. However, as the court pointed out in *ACL Technologies*, "[i]t is one thing for meanings of individual words to overlap. It is quite another to interpret them so

that they add nothing in the context in which they are used." *ACL Technologies*, at 1787.

Finally, the majority's conclusion violates all relevant rules of construction. First, insurance policy language must be interpreted in the way it would be understood by the average person. *National Union Fire Ins. Co. v. Zuver*, 110 Wn.2d 207, 210, 750 P.2d 1247 (1988). It borders on the incredible to say that the release of contaminants over a 30-year period occurred "suddenly". Surely the average person would not expect this result.

> One of the less remarked aspects in the great war over the pollution exclusion is this: whatever "sudden" means, it does not mean gradual. The ordinary person would never think that something which happened gradually also happened suddenly. The words are antonyms.

*ACL Technologies*, at 1788.

Second, an insurance provision is ambiguous when it is fairly susceptible to two different interpretations, both of which are *reasonable. Stanley v. Safeco Ins. Co. of Am.*, 109 Wn.2d 738, 741, 747 P.2d 1091 (1988). "[N]o *objectively* reasonable policyholder would expect the word 'sudden' to allow for coverage for gradual pollution. 'Sudden' never means *both* 'unexpected and gradual.' " *ACL Technologies*, at 1789.

Finally, an insurance policy should be interpreted so as to give effect to each provision; exclusions should not be read out of policies. *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 734, 837 P.2d 1000 (1992); *Fiscus Motor Freight, Inc. v. Universal Sec. Ins. Co.*, 53 Wash. App. 777, 787, 770 P.2d 679, *review denied*, 113 Wn.2d 1003 (1989). Disregarding the temporal meaning of "sudden" and interpreting it as meaning only "unexpected" when "accidental" also means "unexpected" deprives "sudden" of any significance.

2. *The qualified pollution exclusions at issue are not ambiguous as to the relevant polluting event.*

The majority concludes that the terms "discharge, dispersal, release or escape" are ambiguous because they can be defined in a manner consistent with the migration of wastes

from an earthen pit into groundwater. The majority's analysis on this point is internally inconsistent and artificial. Moreover, it is not supported by the rulings of the majority of courts which have addressed the issue.

First, the majority acknowledges that the vast majority of courts agree that the focus of the pollution exclusion is on the polluting event, not the resulting damage. Majority, at 88. On this point I agree — the pollution exclusion focuses upon the discharge of contaminants, not on pollution damage. The latter is the focus of the occurrence clause. *See* Beatty, at 411.

Despite this conclusion, the majority finds that the critical contaminant release under the qualified pollution exclusion is the discharge to third party property, *i.e.*, the migration into groundwater. This focus on the escape or migration as the polluting event is simply another way of equating the occurrence clause with the exclusion clause since it focuses on the resulting damage.

A particularly cogent discussion appears in *Broderick Inv. Co. v. Hartford Accident & Indem. Co.*, 954 F.2d 601 (10th Cir. 1992).

> BIC urges that the term "discharge" may be interpreted reasonably to mean "to let go," "release from confinement" or "to give outlet to." The term "discharge" does not stand alone in the policy and must be read in the context of the remainder of the language of the clause; most significantly, the term "discharge" precedes the phrase "into or upon the land." Even when we employ BIC's definitions in place of the word "discharge," we conclude that BIC discharged — or "let go" or "released from confinement" — the waste "into or upon the land." Because the containment ponds are land, any other interpretation of the phrase "discharge . . . into or upon the land" runs counter to common sense, plain meaning, and ordinary usage.

> BIC argues that it intended to contain the waste in the ponds and that the subsequent release or escape that contaminated the groundwater was not intended or expected. With this argument, BIC tries to shift the focus to the second discharge and attempts to graft an intent requirement related to *damages* onto the unambiguous language of the policy's exclusion clause. However, whether BIC intended the waste to seep into ground-

water and cause damage after the initial discharges into the land is not relevant.

(Footnotes omitted.) *Broderick*, at 607. The cases relied on by the majority likewise focus on resulting damage, not the polluting event. This is particularly clear from the discussion in one of the cases which support the majority's conclusion:

> Since landfills were expected and intended to contain any wastes placed in them, pollutants deposited in a landfill could only cause property damage if there was a "discharge, dispersal, release or escape" of those pollutants from the landfill into the surrounding environment. Thus, the deposit of pollutants into a landfill cannot be the triggering event; rather, the "escape" is the critical inquiry . . ..

*Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 480 N.W.2d 368, 373-74 (Minn. Ct. App.), *review denied* (Mar. 26, 1992). It is precisely that focus which has been rejected by the great majority of courts.[12]

Second, in the ordinary case, such as the one before us, there is but one continuous polluting event beginning with the initial dumping. It is an unreasonable stretch to say migration is a polluting event separate from the initial dumping of pollutants into the ground. By employing this artificial distinction the majority insures that coverage will rarely, if ever, be denied since the secondary event, the migration, will not be attributable to an activity of the insured.

More importantly, the overwhelming majority of courts considering the question have held, explicitly or implicitly,

---

[12]Prior to citing the passage quoted above, the majority states that its interpretation of the terms discharge, dispersal, release or escape must be made based on the expectation of the average purchaser of insurance who "would expect broad coverage for liability arising from business operations". Majority, at 78. Again, this focuses on the "occurrence" clause instead of the exclusion clause. Further, it is difficult to believe that the average purchaser of an insurance policy which includes an exclusion for polluting would conclude that the dumping of thousands of barrels of contaminants into earth pits over a 30-year period would be covered.

that the focus of the pollution exclusion is on the initial disposal into the environment, in this case onto the land. In a relatively early case, *Travelers Indem. Co. v. Dingwell*, 414 A.2d 220 (Me. 1980), the Supreme Court of Maine recognized that the pollution exclusion relates to the initial polluting event, not to the subsequent migration which causes damage. The Maine high court held that the trial court had erred in relying on allegations that contaminants had "permeated the ground" and "spread in the water table" in determining whether polluting discharges were "sudden and accidental". The court said that the "behavior of the pollutants in the environment, *after* release, is irrelevant" to analyzing the pollution exclusion. *Travelers*, at 224-25.

More recently, the Michigan Supreme Court held that an insured suing for damages resulting from its pesticide spraying activities was not entitled to coverage under the qualified pollution exclusion because, even though the insured had not intended the further dispersal within the environment that caused the property damage, "[i]t is clear that the discharge, dispersal, release, or escape to which both the exclusion and the exception refer is the initial discharge, . . . not the subsequent migration." *Protective Nat'l Ins. Co. v. Woodhaven*, 438 Mich. 154, 162, 476 N.W.2d 374 (1991); *see also Broderick*, at 607 (focusing on discharge — *i.e.*, placement of wastes into unlined pits; held that "[w]ithout the discharge into the holding ponds, the resulting groundwater contamination simply would not have developed"); *Mays v. Transamerica Ins. Co.*, 103 Or. App. 578, 585, 799 P.2d 653 (1990) (where insured intended to release pollutants into waste pit over 12 to 13 years, coverage excluded), *review denied*, 311 Or. 150 (1991); *Oklahoma Pub'g Co. v. Kansas City Fire & Marine Ins. Co.*, 805 F. Supp. 905, 910 (D. Okla. 1992) (routine discharge over years of hazardous waste at waste disposal site is not sudden or accidental).

The facts of another case recently decided by New York's highest court vividly illustrates the flaw in the majority's approach. The high court said that the intentional discharge

of wastes into a creek that caused contamination downstream was not accidental and, therefore, the exclusion barred coverage for the downstream, unintended property damage. *Technicon Elecs. Corp. v. American Home Assur. Co.*, 74 N.Y.2d 66, 73, 542 N.E.2d 1048 (1989). Had the New York court followed the majority in this case, coverage would not have been excluded because it is the subsequent event of "migration" which is the focus of the pollution exclusion according to the majority. Thus, the initial polluting event, the dumping of pollutants in the creek, would be irrelevant. The majority seeks to avoid this absurd result by stating that the relevant polluting event may be the initial dumping or discharge when an "active polluter" (bad polluter) is involved. Majority, at 90. This distinction between an "intentional polluter" (bad polluter) and the polluter who only discharges contaminants in landfills (good polluter) is artificial and ultimately can only be effectuated by making the relevant polluting event into a moving target. This analysis is not supportable either under the policy language nor any recognized rule of construction and should not be adopted by this court.

3. *The initial deposit of contaminants into the Queen City pits was not "accidental".*

Just as the term "sudden" is unambiguous, so too is the term "accidental". Unless the polluting event is both "sudden" and "accidental" coverage is excluded. In this case, the daily, continuous dumping of pollutants was certainly not accidental.

The majority does not reach this issue because it incorrectly focuses on the second event, the migration of pollutants with its resulting damage. Again, nearly every court considering this issue has found either explicitly or implicitly that the initial, intentional dispersal of contaminants into the environment is not "accidental" and is excluded from coverage. The rationale for this conclusion is persuasively discussed in a recent federal appellate court decision applying New Jersey law. In that case, the court rejected the insured's argument that pollution damage arising from

its intentional disposal of waste sludge at a landfill was not barred from coverage by the pollution exclusion. The court noted that

> no evidence was presented to the court below to demonstrate that Triangle did not expect and intend its sludge to be dumped upon the ground at the landfill. The sludge was a normal by-product of Triangle's manufacturing operation. The company hired trucks to haul the waste to the Ohio landfill. And Triangle corresponded with persons at the landfill, discussing the liquidity of the semi-solid sludge being dumped at the fill. Given this, we agree with the district court that the open dumping of a sludge onto the ground, particularly when performed as part of a regular business activity, cannot be considered an accidental discharge of the contaminant.

*Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1158 (4th Cir.), *cert. denied*, 113 S. Ct. 78 (1992).

As the New York court in *Technicon* stated, the pollution exclusion should apply to intentional discharges even where the subsequent dispersal of contaminants could be seen as accidental. Were this not the case, the court said "there would always be potential coverage . . . even where the insured is shown to have deliberately and repeatedly polluted the land, water or air over a long period of time, merely because it cannot be known where the toxic substance will flow or what damage will ultimately result". *Technicon*, 141 A.D.2d at 139. *See also New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1428 (2d Cir. 1991) (the release of hazardous waste upon land or into a watercourse through long term industrial practice is an intentional release into the environment which cannot be considered accidental); *Simpson Paper Co. v. Central Nat'l Ins.*, No. C92-1352C, 7-8 (W.D. Wash. Jan. 20, 1994) (order on defendants' motion for summary judgment) (discharge of industrial pollutants by permit to Los Angeles County Sanitation District treatment plant excluded as neither "sudden" nor "accidental"); *Weber v. IMT Ins. Co.*, 462 N.W.2d 283, 287 (Iowa 1990) (court need not decide if spillage of waste material on road was sudden since the spill was not accidental and therefore not sudden and accidental under the pollution exclusion); *Powers Chemco, Inc. v. Federal Ins. Co.*, 74

N.Y.2d 910, 911, 548 N.E.2d 1301 (1989) (intentional disposal of hazardous wastes in pits, with the ultimate pollution of the environment, is not "accidental" as a matter of law under *Technicon Elecs. Corp. v. American Home Assur. Co.*, 74 N.Y.2d 66, 542 N.E.2d 1048 (1989)).

It is also significant that even in cases where the court found "sudden" was ambiguous coverage has nonetheless been denied under the "accidental" language of the pollution exclusion. *Harleysville Mut. Ins. Co. v. Sussex Cy.*, 831 F. Supp. 1111 (D. Del. 1993) (applying Delaware law; concluded that the act of dumping pollutants into a landfill was not accidental and thus coverage was excluded); *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 810 F. Supp. 1406 (D. Del. 1992) (applying Connecticut law the court found that while the term "sudden" is ambiguous the discharge here was intentional and thus fell within the pollution exclusion); *Smith v. Hughes Aircraft Co. Corp.*, 783 F. Supp. 1222 (D. Ariz. 1991) (applying Arizona law the court found that "sudden" would be ambiguous, however disallowed coverage for pollution practices spanning a 20-year period).

4. *A consideration of the drafting history in this case is unwarranted.*

The majority has unnecessarily and unjustifiably introduced a new rule of insurance construction in order to drag the drafting history from other states into this court's consideration. To justify this, the majority states that it is considering the drafting history presented in other states, not as extrinsic evidence but, rather, to decide whether another reasonable interpretation of the contract terms exists. The majority is offering a distinction without a difference. The mere fact that other courts have published their consideration of extrinsic evidence, here the drafting history, does not elevate that evidence to law. It is still extrinsic evidence when considered by this court. Moreover, this "new" rule which the majority uses to support its consideration of drafting history, which was neither presented nor considered below, runs contra to insurance law in this

state. In Washington, extrinsic evidence is not admissible unless ambiguity is found. *Greer v. Northwestern Nat'l Ins. Co.*, 109 Wn.2d 191, 201, 743 P.2d 1244 (1987). An ambiguity will not be found unless there are two reasonable constructions of the terms in dispute. *Stanley*, at 741. The majority here uses extrinsic evidence, the drafting history, to find another reasonable interpretation of contract terms. Extrinsic evidence has never been admitted in this state as an aid to finding ambiguity. The majority is needlessly setting a dangerous precedent.

CONCLUSION

The routine dumping of wastes over many years is neither sudden nor accidental. When property damage arises from planned discharges conducted as normal business operations, regardless of whether the insured intended the ensuing damage, the discharge cannot be sudden or accidental, unexpected or unintended and the pollution exclusion bars coverage.

DURHAM and GUY, JJ., concur with MADSEN, J.

After modification, further reconsideration denied March 22, 1995.